STATE OF NEBRASKA, EX REL. BEE BUILDING COMPANY ET
AL., RELATORS, V. EZRA P. SAVAGE, GOVERNOR, ET AL.,
RESPONDENTS.

FILED SEPTEMBER 18, 1902.  No. 12,723.

1. **Pleadings**: CONSTRUCTION: FRAUD: ASSESSMENT.  Pleadings con-
strued, and *held* to present an issue of fraud in regard to
the manner of making the assessment complained of.

2. **State Board of Equalization**: ASSESSMENT: RAILROADS: TELEGRAPHS:
PROPERTY: EXCEPTION.  It is the duty of the state board of
equalization to value and assess for purposes of taxation, all
railroad and telegraph properties of all kinds within the state,
with the exceptions mentioned in sections 39 and 40 of the
revenue act.

3. **Assessing Property**: ORGANIC LAW: DOMINANT IDEA.  In assessing
property for taxation the dominant idea of the organic law
is that needful revenues shall be raised by levying a tax on
property by valuation, in such manner that every owner of
property subject to taxation shall pay taxes in proportion to
the value of the property owned.

4. **Constitution**: "PROPERTY:" GENERIC TERM.  The word "property".
as used in the constitution is a generic term, and includes
all property of whatever description, whether tangible or
intangible.

5. **Revenue Act**: ASSESSMENT: TAX: JUDICIAL NOTICE: PURPOSES:
STANDARD OF VALUATION.  While the revenue act provides for
the assessment for tax purposes of all property at its fair
cash value, the court will take judicial notice of the fact that
for general revenue purposes the standard of valuation gener-
ally prevailing is far below the actual cash value of the
property assessed.

6. **Constitutional Rule of Uniformity**: PROPERTY WHICH ESCAPES
TAXATION.  In observing the constitutional rule of uniformity,
property which escapes taxes altogether can not be taken into
account in determining the standard of valuation of property
actually listed, returned and assessed, on which taxes are
levied.

7. **State Board of Equalization**: FRANCHISES.  The state board of
equalization, in the assessment of railroad and telegraph
properties, should include in its assessment the value of the
franchise with the tangible property assessed.

8. **Assessment**: RAILROAD AND TELEGRAPH PROPERTY: RETURNS:
INFORMATION.  In the assessment of railroad and telegraph

property, the state board of equalization may consider not only the returns required to be made by sections 39 and 40 of the revenue act but also all other information of a reliable character obtainable which may tend to establish the true value of the property assessed.

9. **Revenue Act: Assessment: Capital Stock: Provisions not Applicable.** The provisions of section 32 of the revenue act, requiring the assessment of the capital stock of the corporations therein named, at its actual value, after deducting therefrom the value of the real estate and personal property of such corporation assessed as such, are not applicable to the assessment made by the state board of equalization of the properties of railroad and telegraph companies.

10. **Provisions of Law Complete: Capable of Enforcement.** Sections 39 and 40 of the revenue act embrace the legislative plan and method of assessing railroad and telegraph properties which are complete within themselves, and capable of enforcement independent of the provisions of section 32.

11. **Assessing Railroad and Telegraph Property: Duty of Board.** In assessing railroad and telegraph property, it is the duty of the state board of equalization to secure all reasonable and necessary reliable information relative to the value of the entire property of each corporation assessed, and assess such property as a unit or as one property.

12. ———: **Tangible and Intangible.** In determining the value of the property assessed, it is the duty of the board to consider all factors having the elements of property, whether tangible or intangible, which enhance the value of the corporate estate, and value such property for assessment purposes so that the valuation placed thereon shall harmonize with the constitutional rule of uniformity.

13. **Railroad: Telegraph: More Than One State: Rule of Assessment.** Where railroad and telegraph properties are situated in more than one state, it is necessary to consider and determine the value of the whole property, wherever situated, as an entirety, and then determine what proportion of the whole property is situated and used in this state and subject to taxation therein; the relation such part bears to the whole property as to its value being the basis on which the assessment is to be made.

14. **Stocks: Bonds: Market Value: Important Factor.** The market value of the stocks and bonds of a railroad corporation is an important factor, with other pertinent information, by which to determine the fair cash value of the property assessed which is represented by such stocks and bonds.

15. **Earnings of Railroad Company.** The earnings of a railroad com-

pany is evidence of a most important character in determining the true value of the property from which the earnings accrue, and is one of the chief elements which give value to the property, and should be considered in determining the value for assessment purposes of the entire corporate property which is assessed.

16. **What Constitutes Assessment of Franchise.** Where the property of a railroad corporation is assessed by the state board of equalization as a unit, and in fixing the value thereof the board takes into consideration the fact that the property is being used for effectuating the objects of the corporation, is earning an income in the transportation of passengers and carrying of freight for hire, and that such corporation is exercising the rights, powers and privileges of corporations organized for the purpose of engaging in business as common carriers, such assessment, so made, would include and cover the intangible as well as the tangible property of the corporation, and would be an assessment of its franchise.

17. **Evidence:** FRANCHISE: PHYSICAL PROPERTY: ASSESSMENT. Evidence examined in the case at bar, and *held* that in the assessment of the properties of the railroad and telegraph companies by respondents the franchises of such corporations were valued and assessed in the assessment of the physical properties of such corporations.

18. **State Board:** SPECIAL TRIBUNAL. The state board of equalization is by law constituted a special tribunal for the purpose of assessing railroad and telegraph properties, and in the valuation and assessment of such property for taxation purposes it is given exclusive jurisdiction.

19. ————: ————: QUASI-JUDICIAL POWER. In assessing property for taxation purposes the board is clothed with *quasi*-judicial powers as to the valuation of such property, and when it has once acted on sufficient information, and expressed an honest judgment as to such value, its judgment can not be controlled by the writ of mandamus. The writ of mandamus is not a writ to correct errors, but to compel action.

20. **Presumption:** ASSESSING BODY: VALUATION: FAIRNESS AND IMPARTIALITY. The presumption is that, when an officer or assessing body values property for assessment purposes, he acts fairly and impartially in fixing such valuation.

21. ————: ————: ————: ————: DISCRIMINATION: CASE AT BAR: EVIDENCE. *Held,* In the case at bar, under the evidence, the inference is not warrantable that the respondents acted from improper motives and fraudulently, in making the assessment complained of, with the wrongful intention of discriminating in favor of the railroad and telegraph companies whose property was assessed.

State v. Savage.

22. **What is a Fraudulent Assessment?** Where an assessing officer or board disregards well-known rules for the valuation of property assessed, and has refused to consider reliable and pertinent information regarding such values, and arbitrarily assesses property at a grossly inadequate sum, such assessment may be treated as fraudulent, and as, in law, no assessment.

23. **Standard of Valuation.** Where in the assessment of property for municipal purposes in cities of the metropolitan and first class different standards of valuation prevail than in the assessment of property generally throughout the state for general revenue purposes, and the state board of equalization can not assess property in harmony with such different standards of valuation, it is the duty to observe the rule of uniformity of valuation of property assessed generally for revenue purposes, rather than the standard prevailing in the cities of the classes mentioned when property therein is assessed for municipal purposes.

24. **Uniformity:** CONSTITUTION. The constitution requires that in the assessment of taxes for municipal purposes, such taxes shall be uniform with respect to persons and property within the jurisdiction of the body imposing the same.

25. **Railroad:** TELEGRAPH: ASSESSMENT: STATE BOARD OF EQUALIZA- TION: ASSESSMENT FOR MUNICIPAL PURPOSES. Whether the provisions of law requiring that valuation of railroad and telegraph property for assessment purposes made by the state board of equalization, shall be taken and accepted as a correct assessed valuation of such property for municipal purposes in cities of the metropolitan and first class, when a different standard of valuation prevails as to the assessment of all other property in such cities, violates the constitutional provision requiring taxes to be uniform throughout such municipality as an independent taxing jurisdiction,—*quære*.

26. **State Board of Equalization:** SLEEPING AND DINING CARS: EXCLU- SIVE METHOD OF ASSESSMENT: PROVINCE OF LEGISLATURE. The power of the state board of equalization to value and assess for tax purposes sleeping and dining cars operated on railroads in this state is derived from the statute, it being within the province of the legislature to select a method by which all such properties shall be valued and assessed, which is exclusive when no constitutional rule is violated.

27. ———: ———: ———: FRANCHISES OF CORPORATION: COST OF CON- STRUCTION: TRUE VALUE. In assessing sleeping and dining cars under the provisions of sections 40a and 40b of the revenue act, the board can not value and assess the franchises or other intangible property of the corporations owning such cars as independent species of property. In estimating the value of such property for assessment purposes the assessing board, in

determining the value thereof, is not confined alone to the cost
of construction, but may consider the value of the property
assessed as a means of earning income, the profitableness of
the use to which it is put, and ascertain and fix its true value
for assessment purposes with reference to the value it has as
used and by reason of its use.

ORIGINAL proceeding in mandamus to compel the state
board of equalization, consisting of Ezra P. Savage, governor, Charles Weston, auditor, and William Stuefer,
treasurer, to reassemble as such board, and to compel the
respondent, Charles Weston, to proceed immediately to
collect the information as required by sections 32, 39
and 40a of chapter 77, Compiled Statutes, entitled "Revenue," or in such other manner as may appear to be most
effectual, and to compel said board to fully and carefully
examine into the question of the fair value of the property
including the franchises of certain corporations named in
the relator's application, subject to taxation in the state
of Nebraska for the year 1892, and that they give a full
hearing in the premises. The details of such prayer are
more fully set forth in the record. The action was upon
the relation of the Bee Publishing Company. Michael F.
Harrington afterwards appeared as intervener and joined
in the relator's prayer.

The case was argued orally by *Howe, Harrington* and
*Simeral* for relator and intervener; and by the *Attorney
General, White, Kelby,*\* *Baldwin* and *Ransom*\* for the
respondents.

*Edward W. Simeral,* for relator: I presume your honors
are thoroughly familiar with the *Goggin Case* (*State
Board of Equalization v. People,* 191 Ill., 528, 537, 61 N.
E. Rep., 339):

The net assessment of the capital stock and franchises of
the Chicago Consolidated Traction Company over and above
its tangible property as assessed by the local assessors was
fixed by the state board at $100,000, while that of the Chicago Union Traction Company was fixed at $600,000, which,

\*The arguments of Kelby and Ransom were along the line of the
decision.—W. F. B.

according to the contention of counsel for respondents, would make the net total assessable cash value of the capital stock and franchises of said thirteen omitted companies and said Chicago Consolidated Traction Company and Chicago Union Traction Company aggregate the sum of $700,000, while the uncontradicted evidence establishes beyond doubt that the cash value of the capital stock of the Chicago Consolidated Traction Company and Chicago Union Traction Company, together with their bonded indebtedness after deducting therefrom the assessed value of their tangible property, alone exceeds that amount by a large sum. It therefore clearly appears that the capital stock and franchises of said thirteen omitted companies, as a matter of fact, were not valued and assessed by said state board of equalization to said several corporations, nor were the same included in the assessment of said traction companies, but that the same were wholly omitted from the assessment of 1900. We have repeatedly held that an assessment may be impeached on the ground that property has been fraudulently assessed at too high a rate. In *Pacific Hotel Co. v. Lieb,* 83 Ill., 602, 609, we say: "Where the valuation is so grossly out of the way as to show that the assessor could not have been honest in his valuation—must reasonably have known that it was excessive—it is accepted as evidence of a fraud upon his part against the taxpayer and the court will interpose." And in *Chicago, B. & Q. R. Co. v. Cole,* 75 Ill., 591, 594: "Valuations must be the result of honest judgment, and not of mere will." The converse of the proposition must be true, and an assessment may be impeached where the assessment has been fraudulently made at too low a rate.

*Michael F. Harrington,* for himself: Valuation must be the result of honest judgment and not mere will. *Chicago, B. & Q. R. Co. v. Cole,* 75 Ill., 591.

While it is true that fraud will not be presumed, and that the decision of the state board of equalization in fixing the value of corporate property for the purposes of

taxation is *quasi*-judicial in its nature, still when it is apparent to the court that every well-known rule for the valuation of capital stock, including franchises, has been violated and arbitrarily disregarded by the board, and such board has refused to consider the statements as to values prepared by the assessors, under the statute for its use, and has refused to consider information as to the value of such corporate property submitted to it by interested parties, and has arbitrarily fixed such assessments at a grossly inadequate sum under rules passed by it for the occasion, the court is justified in holding that fraud in the making of such assessments has been established, and such pretended assessments may be properly disregarded and treated as no assessment and such board be coerced by the writ of mandamus to assess such property. *State Board of Equalization v. People,* 191 Ill., 528, 61 N. E. Rep., 339, 343.

The next thing to be considered is whether or not the railway companies of the state are paying a tax in proportion to their property ownership. First, we will ascertain the general rule of assessment of property in the state. Our basis here is not founded upon imagination; it is based upon the public records and rests upon the testimony in this case. The returns from Douglas county show that for all county and state purposes the property of the county is assessed at one-sixth of its fair cash value. This is one of the two heavy tax-paying counties of the state. Thirteen other counties returned that their property is assessed at one-fourth of its fair cash value; nine counties at one-third of its fair cash value; four at one-sixth; two at one-seventh; twenty-one at one-fifth; one at one-eighth; the others, with two exceptions, range from one-fifth to one-tenth. I am within the bounds of truth when I say that property generally in Nebraska is assessed at one-sixth of its cash value.

Now let us look at the railroads. I will take the Union Pacific, because it is the biggest sinner in the lot. The Union Pacific railroad, according to Poor's Manual, ac-

cording to the interstate commerce commission and according to their own report, has 2,967 miles of road. Mind you, I am talking of the entire line from Council Bluffs to Ogden, including branch lines in Colorado, Kansas, Nebraska and elsewhere, but not of affiliated lines operating under their own charters. The bonded debt of the Union Pacific in that way is $99,500,000, the bonds floated $194,-602,300, not including the $445,000 in the treasury. These bonds are at a premium. The common stock is a little below par; it fluctuates. The preferred stock is at a premium. I have taken both bonds and stock at par. I know this is conservative. Under the rule laid down by every court since the precedent established by Judge Miller in the Illinois tax cases (*State Railroad Tax Cases*, 92 U. S. [2 Otto], 575), the value of the stock, plus the bonded debt, measures the value of the entire railroad property, inclusive of franchise. The reason for the rule is apparent. The bonds are the company's promissory notes. If I give my note in purchase of its face value in property, I am neither richer nor poorer. Hence this bonded debt is the complement of the value of the stock which represents the net value of the railroad property. Add the value of their stock to the bonded debt, divide the sum by the number of miles of road line and the quotient will be 100,-000 in round numbers. If we take it on one-sixth basis, at $100,000 a mile, then the Union Pacific railroad should be assessed at $17,000 a mile in round numbers.

Back in the year 1874, when there was one mile of railroad to each ten thousand acres of land subject to taxation, 1,100 miles of railroad were valued by the state board for purposes of taxation at $11,000,000, in round numbers, or slightly more than ten thousand dollars per mile of line. The eleven million acres of land subject to taxation were, by the various assessors, valued at $43,000,000, or $3.91 per acre on the average.

By the year 1901 the railroads had increased their mileage to something more than 5,700 miles, or 415.2 per cent. Land acreage subject to taxation had increased to a little

more than thirty-two million acres, or 192.8 per cent. It would be difficult to say what average increase in actual value, per mile of line and per acre of land, had taken place in the twenty-seven years; but it must be remembered that although the 1,100 miles in 1874 were chiefly "main lines," yet the eleven million acres then subject to taxation were located in what must be considered the very garden spot of Nebraska; and that although the 5,700 miles in 1901 included a considerable of "branch lines" or "feeders," yet also the thirty-two million acres included considerable "sand-hills" and other land of inferior quality. Hence, it is not unreasonable to assume that in the march of progress land and railroads had gone hand in hand and that the increase in actual value of an average mile of railroad had fully kept pace with the increase in actual value of an average acre of land.

But what do the tax records show? A careful analysis of the situation year by year shows a contest between the state board on the one hand and the assessors on the other in pressing down the assessed valuation of railroads per mile and land per acre. The general trend has been for the assessors to follow the board. A graphic history of this contest is shown by the official records of the valuations placed upon the two classes of property by the two contending forces:

### Assessed Valuations.

| Year. | Railroads Per Mile. | Lands Per Acre. |
|---|---|---|
| 1874 | $10,095.89 | $3.91 |
| 1875 | 8,752.30 | 3.62 |
| 1876 | 8,081.55 | 3.49 |
| 1877 | 7,146.83 | 3.10 |
| 1878 | 6,938.15 | 3.00 |
| 1879 | 7,074.86 | 2.86 |
| 1880 | 6,124.65 | 3.37 |
| 1881 | 6,552.61 | 3.20 |
| 1882 | 6,315.03 | 3.05 |
| 1883 | 6,587.21 | 3.21 |
| 1884 | 6,619.43 | 3.32 |

State v. Savage.

| Year. | Railroads Per Mile. | Lands Per Acre. |
|---|---|---|
| 1885 | $6,702.18 | $3.49 |
| 1886 | 6,520.00 | 3.52 |
| 1887 | 6,150.00 | 3.17 |
| 1888 | 5,828.00 | 3.09 |
| 1889 | 5,879.10 | 3.06 |
| 1890 | 5,788.42 | 2.98 |
| 1894 | 5,040.88 | 2.87 |
| 1895 | 4,587.26 | 2.79 |
| 1896 | 4,587.32 | 2.71 |
| 1897 | 4,612.23 | 2.58 |
| 1898 | 4,710.70 | 2.52 |
| 1901 | 4,630.43 | 2.47 |

Comparing the year 1901 with 1874, the per-mileage assessed valuation of railroads had been decreased $5,-465.46, or 54.1 per cent., while the per-acre assessed valuation of land had been decreased $1.44, or 36.8 per cent. Assuming that the two classes of property had both increased in actual value in like proportion, an equitable assessment of railroad property that year should have been at an average of $6,380.60 per mile, or substantially ten million dollars greater than it actually was.

In the year 1901 forty-eight out of ninety Nebraska counties reported the "standard of assessment" employed by the assessors, that is to say, the fraction of actual value at which property was assessed. Nine of them—Banner, Blaine, Brown, Cheyenne, Dakota, Dundy, Garfield, Holt and Knox—reported one-third as the standard; eleven others—Box Butte, Burt, Custer, Dodge, Frontier, Grant, Kearney, Nemaha, Nuckolls, Saline and Sheridan—used one-fourth as the standard; Adams, Cass, Cedar, Cuming, Furnas, Jefferson, Lancaster, Lincoln, Madison, Merrick, Nance, Pawnee, Phelps, Pierce, Red Willow, Sarpy, Seward, Sherman, Stanton and Valley—twenty in all—assessed at one-fifth of actual value; four others—Douglas, Hamilton, Johnson, and Wayne—at one-sixth; Butler and York at one-seventh; Hall at one-eighth; and Saunders at one-tenth. Without attempting an elaborate

problem in averages, by taking cognizance of the differences in the total mass of assessed property in each county, the average standard of assessment for the forty-eight counties was 9,179-840ths divided by 48, or 22.7 per cent.—in common fractions between one-fourth and one-fifth.

Making allowance for the factor left out in making this average, and still further allowance for the differences of opinion as to what one-third, one-fourth, one-fifth, one-sixth, etc., of "actual value" really was—and to be conservative—let us assume that the average standard of assessment, the state over, was, in 1901, not greater than one-seventh on all property valued by the assessors.

Nebraska is the principal state in group VII as outlined by the Interstate Commerce Commission. The average railroad capitalization in the entire group was, in 1901, substantially $52,000 per mile, divided as follows:

Stocks..........................$28,627
Bonds........................... 23,325

Total..........................$51,952

Inasmuch as this average includes a large portion of the Union Pacific capitalization of $101,444 per mile, nearly a thousand miles being in Nebraska, it is conservative to say that the face value of the capitalization of Nebraska railroads was $52,000 per mile in 1901. And as this average includes the Burlington stocks of $15,823 per mile, which commanded 200 in the Northern Pacific-Great Northern combine, it is equally conservative to say that every dollar of the $52,000 per mile of stocks and bonds, on the average, was worth 100 cents on the market.

Now, 5,700 miles of Nebraska railroads at $52,000 per mile would be worth $296,400,000—a conservative figure; many experts placing the value at $325,000,000 to $350,-000,000. Assessed at one-seventh of actual value, an equitable assessment would be in round numbers $42,000,-000.

The situation in 1902 was not materially different, the

State v. Savage.

railroad assessment being substantially the same per mile of line, while lands were assessed at an average of $2.53 per acre—an advance of six cents.

*Frank N. Prout, Attorney General, John N. Baldwin, Charles F. Manderson, James E. Kelby, Benjamin T. White* and *Frank T. Ransom, contra.*

*Frank N. Prout, Attorney General,* on behalf of respondents: Counsel for relators in this action, for some purpose not pertinent to the issues of record, have sought to impugn the motive and integrity of the respondents sitting as a board of equalization. They appear to think the easiest way to enlighten the court as to the law is to blacken the character of the litigant. The pretext for the unwarranted assault is the amended answer filed by the board. The indictment reads:

"The first answer or return was a fair, honest and manly one. It was the answer of a million people. It told the truth. It did not please the railroads. Upon their demand, another answer was made. The railroads, in a suit to which they were not parties, prepared a second answer. They usurped the state board of equalization! All that has been said in this argument regarding the abuse of the people by the franchise, is justified by this single act. In the face of this shameless performance, who can doubt that it is time for open revolt by the people!"

In the face of such logic, so pregnant with statement, so evidential of deep research, so alive with legal principles, this court is expected to lead the people in "open revolt." To the tirade of counsel, we reply that, in our judgment, this honorable court will settle the questions involved in this suit in its usual way along lines of legal jurisprudence, ungoaded and unimpeded by the false charge of bad faith. I have no fault to find with the relators in instituting this action. It is to be regretted that such an action was not begun years ago. It involves valuable rights, and the public welfare demands a judicial pronouncement defining the duties and powers of the state board of equal-

ization. The respondents accepted the interpretation given to the law by all their predecessors in office since the state was admitted. They acted in good faith; and we refuse to accept the implied conclusion of counsel's argument that every governor and every treasurer and every auditor the state ever had were tools of franchise owners and conspired together to the injury of the state and to the profit of the tax-shirker. The fact remains that year after year, succeeding state equalization boards have convened and assessed corporation properties, and never before has it been suggested to them that the franchises of these corporations were assessable as separate and distinct items; and when this year, for the first time, it was urged before them that the separate franchise value should be added to the value of the visible property, the board hesitated, preferring to follow the rule of contemporaneous construction given to the law by the executive department of the state for more than thirty years until directed to do otherwise by the judicial department.

Counsel feign to view with alarm the amended answer. Their fears are groundless. There is no vital or material difference in the two answers. The first asserted a conclusion, to wit, that the franchises were not assessed. The amended answer, in detail, alleged the facts and the matters actually considered by the board in arriving at its conclusion when it fixed the assessment. Surely no bonafide litigant should complain because the full and true facts are disclosed to the court. The writer has known the relators too long to believe they desire the truth to be suppressed.

The issues in this case are issues of law purely: First. Is a railroad franchise assessable? Second. If it is, how should its value be determined?

There is no doubt in the writer's opinion but that the franchise is assessable. It is property; it is property of value. The general provision of the statute which uses the word "property" includes and embraces the invisible franchise as well as the visible right of way, depots and roll-

ing stock.    There is no reasonable ground for any other conclusion.

As to the second issue of law there is grave doubt as to the rule.    The doubt arises from the difficulty in separating the value of a car and a car with the right to use it for railroad purposes, provided the court should hold the franchise a separate item for taxation.

Counsel for relators say: "It is absurd to confine the assessment to the value of the car as a physical construction. The car carries the franchise with it.    The same thing may be said of the dining car."    Many authorities are cited to sustain that doctrine.    If that is the rule to be adopted in this state, then the franchises of the several railway companies have been assessed, because it is not suggested by anybody that the board assessed the cars as physical constructions or the engines as old iron, or the right of way as unoccupied territory.

On this question there is nothing to be added to the legal reasons and authorities presented by counsel for the relators and by the numerous friends of the court.    They are entirely exhaustive of the subject, and on them, in behalf of the respondents, the cause is submitted with every confidence in whatever judgment the court may pronounce.

The attorney general further argued the case along the identical lines laid down in the decision of the court.

*White,* for respondents: Under the statute and by the decisions of this court, the issues are made by the alternative writ and the amended answer.    Code of Civil Procedure, sec. 653; *State v. Russell,* 51 Nebr., 777.    It is useless, therefore, for the present purpose, to give consideration to the original answer.

The pleadings and proceedings in mandamus have the same effect and are to be construed as in ordinary civil actions.    *State v. Baushausen,* 49 Nebr., 558.    The respondents, therefore, had a right to file an amended answer, thereby superseding the original answer.

It was the bounden duty of the board to set out in detail the matters and things actually considered by them in fixing values for the purposes of assessment and taxation, so that the court may, as a matter of law, determine what was considered in valuing property.

An amended answer supersedes the first answer in the trial of the case; and no use of the original answer can be made in argument without first offering it in evidence. *Smith v. Wigton,* 35 Nebr., 460; *Woodworth v. Thompson,* 44 Nebr., 311.

For the purpose of taxation in this state the tangible and intangible property of railroad companies are indivisible, and it follows that in considering the items covered by sections 39 and 40, the board assessed all railroad property and, therefore, performed its duty fully and fairly.

A franchise of itself is nothing. Any number of men, not less than five, under section 72 of chapter 16 of the Compiled Statutes of 1901, may obtain a franchise for building a railroad by filing articles and paying the statutory fee as provided in section 3 of article 2, chapter 83, of the Compiled Statutes, which is $10 on each $100,000, and an additional charge of ten cents for each $1,000 of stock authorized in excess of $100,000, also a recording fee of ten cents for each 100 words contained in the articles of incorporation. These privileges are as nothing unless the corporation is provided with capital, procures a right of way, constructs a road-bed over the same upon which it lays its track and over which cars move conveying goods, wares, merchandise and persons, for hire or reward. When a railroad company does those things its tangible and intangible property is being used. Without the tangible property, the right to exist, to charge and collect fares and freight rates, is of no value. The user of the property, the running of trains, the movement of traffic, give vitality to all the property as an entirety. For the purposes of valuation it is indivisible. The franchise may not be sold in this state under an adverse pro-

cess as may the rolling stock and other movable property, by virtue of section 2, article 11, of the constitution of 1875. At common law incorporal hereditaments and franchises, as such, were not subject to levy and sale on execution; and the constitution of the state does not permit such sale. *Milwaukee Steamship Co. v. City of Milwaukee,* 83 Wis., 595; *State v. Anderson,* 90 Wis., 550; *Gue v. Tide Water Canal Co.,* 24 How. [U. S.], 263; *Hammock v. Loan & Trust Co.,* 105 U. S., 90; *East A. R. Co. v. Doe,* 114 U. S., 340, 353.

It is said that the right to condemn lands for railroad purposes and to charge passenger and freight rates for services performed are valuable rights. However this may be, the value attaches from the use of the tangible property when the railroad is considered as an entirety and an operated plant. The rights thus obtained by railroad companies, while valuable through the use and operation of the road, are dearly bought and paid for.

The decisions in the express company cases are not applicable to the conditions existing in this case. The physical unity which attaches to railroad property is lacking in the property of express companies, and, on this account, in many of the states the method of valuing for the purposes of taxation the property of railroad and express companies is different, notably so in the states of Ohio, Kentucky and Missouri, in each of which one statutory method prevails for valuing the property of railroads, and another for that of express companies. *Pacific Express Co. v. Seibert,* 142 U. S., 353; *Adams Express Co. v. Ohio,* 165 U. S., 221.

The constitution of this state provides for the raising of revenue by taxation of property; it does not provide for the taxation of labor employed in the use of property; nor for the taxing of incomes. Sec. 1, art. 9. In the operation of railroads, it is fair to say that from sixty to seventy per cent. of the income thereof is devoted to operating expenses. Fifty per cent. of the operating expenses is undoubtedly devoted to the payment of the labor

of employees. To the extent that interest payments are made upon bonds, dividends declared upon stocks, or net earnings are derived from the operation of property, it must be remembered that fully one-half thereof is contributed by labor, and only the other half by the property used.

To tax on the basis of the aggregate value of stocks and bonds, or net earnings, is to lay an income tax. No private person, nor any other public or private individual enterprise is compelled to respond as for an income tax. To single out railroad companies for exclusive bearers of such, would be an odious discrimination, and abhorrent to the federal constitution.

The state board of equalization is an administrative body clothed with *quasi*-judicial powers; it has the right to exercise a fair discretion in arriving at the valuation of property for assessment. Having jurisdiction, and no fraud being claimed or alleged, its judgment can not be controlled or set aside by the court in this proceeding. The only acts which the court can control by this writ are such as are purely ministerial, and with which nothing like judgment or discretion is connected. *United States v. Seaman,* 17 How. [U. S.], 230; *United States v. Guthrie,* 17 How. [U. S.], 284; *State v. Governor,* 22 Wis., 110; *People v. Contracting Board,* 27 N. Y., 378; *State v. Kendall,* 15 Nebr., 267.

Mandamus will not lie simply because an assessment has been unfair. *Maish v. Arizona,* 164 U. S., 599.

Mandamus can only be resorted to for the purpose of compelling action; it is not a proceeding for the purpose of correcting errors. The action can only be inquired into by some direct proceeding to review it. *State v. Kinkaid,* 23 Nebr., 641; *State v. Holmes,* 38 Nebr., 358; *State v. Merrill,* 43 Nebr., 579; *State v. Piper,* 50 Nebr., 34; *State v. Cornell,* 54 Nebr., 160; *Mayor v. Davenport,* 92 N. Y., 604.

*Baldwin,* for respondents: The first answer of the respondents was undoubtedly made in good faith, but with-

out a clear understanding of its legal effect. They intended to state they had not assessed the franchises of these corporations separately. They knew they had not assessed the property as so much dead material. When their attention was called to the legal effect of the answer, which would have precluded any fair investigation by the courts of the merits of the controversy, they readily assented to setting forth the real facts in the amended answer.

In the case of railroad and telegraph companies it would be grossly unjust, and in fact unconstitutional, as taxing property beyond the jurisdiction of the state, to follow the rule laid down in section 32 of the revenue act, for the assessment of local corporations, that is, to deduct the value of the assessed tangible property from the value of the capital stock, since the value of that capital represents the value of the company's property scattered over perhaps many states. If the legislature had intended section 32 to apply to corporations assessed by the board it would have provided some rule for assessing only a portion of the capital stock in this state, on the basis of the proportionate amount of mileage or value in the state to the whole mileage or value in all the states, or on some such equitable basis, as has been done in other states.

The board has assessed all the properties of the companies and every element of value thereof. They necessarily took into consideration the intangible property or property of the character of prerogative, privileges, franchises and rights, etc., or the assessments were so excessive they could be impeached for fraud. The assessment of the Burlington & Missouri River Railroad main line from Plattsmouth to Kearney was fixed at a valuation of $10,-580 per mile, while the assessed valuation of the Grand Island & Wyoming Central Division of the same company was assessed at $3,400 a mile. We select these two lines for the reason that between these respective points they are practically of the same physical value. That is, on neither of them are there any expensive and valuable im-

provements except at Lincoln. The difference in the as-
sessed valuation of the two lines can only be accounted
for by the fact that the Burlington main line, in its report
to the auditor of public accounts, shows net earnings of
$12,551, while the Grand Island & Wyoming Central Di-
vision was shown to have been operated at a loss of $940
per mile for the year 1900. The difference in assessment
must therefore have been principally accounted for by the
difference in earning capacity of the two lines.

The railroads, particularly the Union Pacific, are as-
sessed at more than one-fifth of the value of the tangible
property and more than one-seventh of the entire stock
and bond values. All other property in the state is as-
sessed on a basis not exceeding one-tenth of its actual
value. In the maximum freight rate case evidence was
introduced by the chief engineer showing the cost of re-
placement or reproduction of the tangible property of the
Union Pacific. The cost of the different items as testified
to by him amounted to $30,853,057. Of this $2,200,000
covered property assessed by the local assessors, leaving
subject to assessment by the state board property to the
value of $28,653,057, or $30,239 per mile for the 947.56
miles of the Union Pacific in the state. This property is
assessed at an average of $6,572 per mile. The stock and
bonded indebtedness of the Union Pacific Railroad Com-
pany was created and made in connection with the Oregon
Short Line and the Oregon Railroad & Navigation Com-
pany. To get an exact and accurate statement of the
stock issued and bonded indebtedness of the Union Pacific,
it must be made in connection with all three of these lines,
taking the three as a whole. The stocks and bonds cover
not only the railroad mileage of the three companies, but
their ownership in securities representing large amounts
of other property. To ascertain the amount of stocks and
bonds issued applicable to the railroad mileage of the
three companies, the amount representing these securities,
which is $332,631,259, must be deducted from the total
amount of the stock issued and bonded indebtedness.

There must also be made a reduction to cover the land grants of the Union Pacific, which are represented by stocks and bonds, and the water-line properties of the Oregon Railroad & Navigation Company. Deducting these three items leaves the total stock and bonds representing the railroad mileage of the three companies, $254,-297,187, which makes bonds and stocks $45,574 per mile. The average assessment of the Union Pacific lines in the state is, per mile, $6,572, which therefore represents more than one-seventh of the stock and bond values as above stated.

On the question of fraud *Mr. John D. Howe* spoke in part as follows:

Now about the fraud alleged. I will speak of the two principal companies. Fraud is alleged. The relator alleges actual knowledge. They did so wrong a thing as to refuse to consider $100,000,000 worth of property, when the people of this state, by their volunteer representatives, urged them to consider it, and after this court had substantially said it is your duty to do it! I refer to the franchises. Past boards have been mistaken, but you have no excuse now to be mistaken as to your duties! What is fraud, if that is not fraud? The whole thing was cut and dried, I have no doubt. What difference did it make to them that the Burlington railroad hadn't made any report or that half a dozen railroads hadn't made any report? What do we want of reports; what do we want of the annual reports of the Q. road? they must have said. The reports should have been filed in January and April, as the constitution and law require. "What do we want of the tax lists or revenue returns called for by the revenue law? Why, we don't need them. They are not here, but we haven't missed them at all." They were not asked for; they were not even missed. Then these delinquent railroads, two or three of them, sent down their annual reports which should have been there in January.

I make the startling statement that the C., B. & Q.

railroad, which operates more railroad in this state than any other company, is not assessed for one penny in the state of Nebraska! Its name is not in the list, it has returned no list, but its auditor, under instructions, has put in fifteen skeletons, not even cadavers or stiffs, with no resemblance to a living thing. It is shown here that the Q. road should be assessed on many millions of dollars, and yet it is not assessed for one cent! Is that fraud or isn't it fraud?

A valuable bit of information is picturesquely brought out in the Union Pacific argument by Mr. Baldwin, which will serve for an illustration. He speaks of the Burlington's so-called "main line" to Kearney. If I were the railroad and had to pay taxes on the main line I would want it a very short line. I would rather pay on 191 miles running out to Kearney than 450 miles running toward Denver. I would make up a pretty good showing of earnings, in some way or other, so as to have some excuse for calling it the main line, because 191 is less than 450. It would cost less. Now that line is assessed for $10,580 a mile, the great "main line," and yet the gentleman tells us, with great, simple honesty, that it earns $12,551 per mile net! Assessed at less than its net earnings! How would you assess a building that would earn $12,551 net? For less than its net earnings—$2,000 less? Here is not one building alone, but 191 buildings.

In Lincoln one building is shown to have earned net, $9,000. What is that assessed for? Ninety-five thousand dollars! About ten times. When I capitalize the Burlington's "main line" net earnings at 4 per cent., which means par, it shows a capitalization of $313,000 per mile for every mile of the 191; therefore that main line is assessed at about one-thirtieth of what we say its value is, valuing it on a basis of 4 per cent.; it is one-thirtieth and is refusing to pay anything to speak of in the cities.

Now we will glance at a few things with reference to the Union Pacific. Their own attorney has endeavored to confuse the issue, by bringing in three great transporta-

tion companies—the Union Pacific system, he says, is composed of three separate transportation companies. The two Oregon companies operate under their own charters and have no property in this state. We have nothing to do with them. We will take that one paper in evidence, the Union Pacific statement, showing "mileage, capital stock, earning and operating expenses" of the Union Pacific Railroad company for the year ending December 31, and the earnings for its mileage in Nebraska alone. It gives gross earnings, operating expenses and net earnings for Nebraska. It shows its net earnings were $4,711 for each and every mile in Nebraska! The Union Pacific is stocked and bonded for over $130,000 for every mile of its road. Every mile is treated like every other mile. Its stock and bonds are worth in the market over $120,000 per mile. Taking, however, these earnings only, and they equal 4.7 (nearly 5) per cent. on $100,000!

Now take all their figures, what do they amount to as compared with that solitary fact? That tells the whole story. And yet the Union Pacific has part of its line, sixty-five miles and a fraction, separated from the parent company as a separate concern, and assessed at $3,000 a mile. One thousand seven hundred dollars less per mile than the net earnings of that same company! Three thousand dollars is less than one-thirtieth of a hundred thousand dollars! There are 414 miles assessed at $3,500, or 3½ per cent. of $100,000, $1,200 less than each and every mile of it earns net! The great main line is assessed at less than 10 per cent.—only 9.8 per cent. on $100,000 ($9,800). Your honors, if that is not fraud, if that assessment is not impeachable, what is the matter with it? Is it full of righteousness or of unrighteousness? At the very lowest, their assessment should be double what it is on the main line, on every mile they have in the state.

I might have said, with reference to the B. & M. company in Nebraska, that it has been dead for twenty-two years. The concern was consolidated with the parent company twenty-two years ago, last January, and the records of

the secretary of state's office contain the record of it. Before leaving the Burlington, I will say that all of its lines here, its fifteen lines, are operated under the Q. charter—the Q. franchise, every mile of it earns an equal amount, and every mile must be assessed alike, main line and branches. So we say that property is worth, according to Mr. Harrington's figures, $50,000 a mile, and its market value $55,000. Its earnings, taken from the people, some of it unfairly taken, make large interest on that, and not for one mile, but for every mile of that system.

Let us see how these railroads are profiting by the refunding process. The New York Central will, this year, save $1,500,000, and from this time on, each year, just by simply refunding high-rate bonds for low-rate bonds. That makes their property so much more valuable. That amount could be laid aside by the New York Central. It will pay interest on $45,000,000 of securities at 4 per cent. They can put that $45,000,000 of assets into their treasury. The Northwestern will save, in the same way, $650,000, equal to $15,000,000, capitalized in that way. The Burlington has already retired some of theirs and next year $22,000,000 bearing 7 per cent. mature, and they can be reduced, I take it, to 3½ per cent. bonds, because the Burlington has got out as the statistics show, 3½ per cent. bonds on the Illinois division, maturing in 1949, in the sum of over $26,000,000 quoted above par. So much for what money is worth, so much for what its use is worth. What will the railroads do? Will these railroad companies cut the rates? Will they reduce the rates? Will they pay more taxes upon their assets? If not, why not? What will they do to do justice to the people?

HOLCOMB, J.

This is an action of mandamus, instituted in this court in the exercise of its original jurisdiction, and brought for the purpose of compelling the respondents, as members of the state board of equalization, to reassemble and reas-

sess the property of the railroad, telegraph, and sleeping car companies doing business in this state, subject to taxation for general revenue purposes for the current year. The respondents, the governor, treasurer and auditor of public accounts, are by law charged with the duty of assessing for revenue purposes the properties of the corporations mentioned subject to taxation within the state, and for that purpose are constituted a state assessing board, in conjunction with their other duties as a state board of equalization. They have, at least in form, discharged the duty thus imposed upon them by assessing the corporate properties over which they are invested with jurisdiction; but it is contended by relators that there has been such a departure from the law in making such assessment that the action taken is thereby invalidated, and recourse is had to this proceeding to secure a valid assessment as by law required. The more essential averments in the affidavit for a writ of mandamus and the alternative writ based thereon are as follows:

"And in this behalf, your relator alleges the truth and the fact to be, that said respondents refused and neglected to assess for taxation for the year 1902, the franchises of any of said railroads, as it was their duty to do, under and by virtue of the constitution and laws of the state of Nebraska, said respondents stating that there was no statute law requiring them to assess the franchises of said railroads, although each and all of said franchises are of great value, the exact value of which is to this relator unknown, but he alleges them to be of the fair value of about $200,000,000 for all of said railway systems, operating and doing business in the state of Nebraska for the year 1902 and for many years last past and that, had said respondents performed their duty in this behalf, and assessed the value of the franchises of said railroad companies and all of them, as by law required for taxation for the year 1902, it would have materially increased the grand total of assessed valuation for said year and so reduced the taxes of all other taxpayers, including those of this relator, in

the state of Nebraska. But that said respondents assessed
the tangible property of all of said railroads operating and
doing business in the state of Nebraska for the year 1902,
at the sum of $26,589,592.70 without taking into consid-
eration the fair value of the franchises of said railroads
or any of them for the year 1902. Your relator also avers
that said board failed and neglected to assess the value
of the franchises of said telegraph companies.   *   *   *
That said respondents as said state board of equalization
as aforesaid, have grossly and knowingly violated their
duty to the people of the state of Nebraska, and to this
relator, by disregarding the plain provisions of the con-
stitution and laws of the state of Nebraska by not assess-
ing the franchises of all of said corporations at their fair
value for taxation for the year 1902."

An amended return by the respondents to the alterna-
tive writ has been filed, wherein it is alleged that after
securing the information contemplated by statute for the
purpose of making an assessment of the corporate prop-
erties therein mentioned, and examining the returns made
by the respective companies, which by law they were re-
quired to make, all of which was done under and by virtue
of the powers conferred upon said board, "that said re-
spondents sitting as such board of equalization, performed
and completed the duty of assessing the properties of said
railroad, telegraph and sleeping car companies on the
16th day of May, 1902; that in arriving at the valuation
of the several properties of said respective companies for
assessment and taxation within the state of Nebraska, said
board of equalization considered the fact that said com-
panies and each of them were actually engaged in using
and operating all of their properties in the performance
of the duties incumbent upon them and each of them by
law to perform, and in transacting the business for which
they and each of them were incorporated; and also con-
sidered the revenues and earnings of said companies from
the use and operation of their several properties; and
thereupon, after full consideration of said matters, each

of the properties of said respective companies was valued as a unit for said purposes of assessment and taxation," and "that said respondents did not believe that under the law defining the powers and duties of the respondent board it had authority to value and assess the corporate franchises of said companies separately and apart from their tangible property and here submit the facts that were actually taken into consideration by said board in the performance of its said duty." The other allegations of the alternative writ are denied.

The relators, as we interpret the pleadings, instituted the action with the object and for the purpose of compelling the board to assemble and reassess all the property it is its duty to assess, on the theory that the board failed to assess the franchises of the several corporations whose property they attempted to assess, which it is claimed and alleged were omitted from the assessment first made, and were not taken into account in assessing such properties; that only the tangible or physical properties were assessed, thus permitting to escape from taxation the most valuable portion of the properties of such corporations, which was an unlawful and unjust discrimination in their favor, and in fraud of the rights of the taxpayers generally, and especially the relators. And, secondly, it is contended that the respondents grossly and wantonly disregarded the law in the assessment of such properties, and valued the same for taxation so grossly inadequate and below their fair actual value as to vitiate the assessment so made; and that in law and fact, the action so taken was a nullity, and amounted to no assessment. By the amended answer, the respondents present the plea that they assessed the tangible and intangible property, including the franchises, of the different corporations assessed, and that the assessment so made was the result of an honest exercise of judgment upon full information and after substantial compliance with the provisions of law governing the matter, and that the valuation placed on such properties was the fair actual value for the purpose of assessment, and

uniform with property generally assessed for purposes of taxation; that they did not assess the franchises separately and apart from the tangible property because they were without authority and power so to do. Under the issues thus presented, and the evidence in support thereof, but two principal questions are presented for consideration and determination; they being: First, has the assessing board failed or neglected to assess property which it is its duty under the law to assess? and, second, in making the assessment complained of, has the board acted fraudulently in valuing such properties for assessment purposes, and for that reason rendered void the action taken? Respondents insist that no question of fraud is presented by the pleadings. We are disposed to the view that the issue of fraud is not as clearly presented as good pleadings would seem to require, and yet we have construed the ninth paragraph of the alternative writ heretofore quoted as raising that issue. We therefore consider the case in the dual aspect in which it seems to be presented.

By section 74, article 1, chapter 77, of the Compiled Statutes, 1901, the governor, auditor of public accounts, and treasurer of the state, are constituted a state board of equalization, with certain powers and duties to be by them discharged, relative to the equalization and levy of all taxes for revenue purposes as therein defined. By sections 39 and 40 it is incumbent on the state board of equalization, consisting of the officers named, to hold a meeting at the office of the state auditor at a time as therein specified, and to value and assess all property of the railroad and telegraph companies situated within this state, or used and operated therein, and subject to taxation. It is therein provided (sec. 40): "and the said board shall then value and assess the property of said corporation[s] at its actual value for each mile of said road or line, the value of each mile to be determined by dividing the sum of the whole valuation by the number of miles of such road or line. In making up such valuation or assessment the said board shall examine and

consider the return herein required to be made, or the
information procured by the auditor in default of such re-
turn, together with such other reliable information rela-
tive thereto as they may be able to procure; said board
shall not assess the value of any machine or repair shop or
general office building, store houses or any real or per-
sonal property situated outside of the right of way or
depot grounds of such company.   On or before the fif-
teenth day of May, or so soon thereafter as the said board,
or any two thereof, shall have made and determined said
valuation and assessment, the auditor shall certify to the
county clerks of the several counties in which the prop-
erty of the aforesaid corporation, or any part thereof, may
be situated, the assessment per mile so made on the prop-
erty of such corporation, specifying the number of miles
and amount in each of such counties.   All such property
shall, for the purpose of taxation, be deemed 'personal
property,' and be placed on the tax list as hereinafter pro-
vided."   These sections make it the duty of the state board
of equalization to value and assess for purposes of taxa-
tion all railroad and telegraph properties of all kinds
within the state, with the exceptions mentioned, subject
to taxation for revenue purposes.   By sections 40a and 40b,
additional duties and powers are conferred upon the board
with respect to the assessment of all sleeping and dining
cars used and operated on the various lines of railway
running in or through the state.   A casual inspection of
the revenue laws discloses that while property generally
which is subject to taxation is assessed by local assessors
in the townships and counties of the state wherein located,
the property of railway, telegraph, sleeping and dining
car companies, on which taxes are to be levied for general
revenue purposes, is to be assessed by the state board of
equalization sitting as an assessing body, and the value
placed thereon as a basis for the levying of taxes to which
such property is subject apportioned to the different coun-
ties, precincts, school districts and the different municipal-
ities of the state in proportion to the number of miles of

such railway or telegraph lines, which are situated in such political or municipal subdivisions. Under the subject of "Revenue and Finances," section 1, article 9, of the constitution, it is ordained that "the legislature shall provide such revenue as may be needful, by levying a tax by valuation, so that every person and corporation shall pay a tax in proportion to the value of his, her or its property and franchises the value to be ascertained in such manner as the legislature shall direct." The dominant idea of the organic law which we have just quoted is that needful revenues for the purpose of defraying expenses of state and municipal government shall be raised by levying a tax on property by valuation in such manner as that every owner of property subject to taxation shall pay taxes in proportion to the value of the property owned. The word "property" is used as a generic term, and in its broad and comprehensive sense, and comprehends, no doubt, all intangible property of whatever description, including franchise, although the latter is expressly specified, as well as physical or tangible property, such as real estate and personal property of a character universally regarded and accepted as proper subjects of taxation. It is equally obvious that in order to comply with the intent and spirit of the fundamental law, as well as the statutes enacted in pursuance thereof, all property valued and assessed for revenue purposes should be assessed at a uniform value, to the end that every person and corporation shall contribute his or its just and fair proportion of the needful revenues for governmental purposes. While the statutes on the subject provide for the assessment of all property at its fair cash value, the fact is notorious, and regarding which we, as a court, may properly take notice, that assessed values generally are far below the fair market value of the property assessed; so much so that it may be said, speaking in general terms, that the property actually returned and assessed for purposes of taxation is assessed for only one-fifth to one-tenth of its reasonable market value, or for such an amount as it would sell for in the open markets.

It is unnecessary that we should, in this connection, do more than to refer briefly to the fact that much property subject to taxation escapes the assessing officers altogether. In determining the value of property for assessment purposes we can not take this class of property into account. Much is said in briefs of counsel on behalf of respondents in regard to the value of all property in the state subject to assessment, as shown by returns of census officers, and other similar statistics. In our judgment, no sound claim can be made for a lower valuation of property returned for assessment purposes on the ground that some of the property subject to assessment escapes taxation altogether. The only safe and satisfactory rule, as we view the subject, is by a comparison of values of property actually returned and listed for taxation, and therefrom ascertain the standard of valuation at which property is assessed, and thus conform to the constitutional rule of uniformity. If some property escapes taxation, this is no reason why railroad property as a class should be valued lower than all other property on which taxes are levied and assessed. If in truth much property which should bear its just proportion of the public burdens escapes taxation, the remedy lies in having it reached by the taxing authorities, and brought to the standard of valuation at which all other classes of property are assessed. The paramount object of the constitution, and the laws relative to taxation, as we conceive the rule to be, is to raise all needful revenues by valuation of the taxable property so that each owner of property taxed will contribute his or its just proportion of the public revenues. The object of the law of uniformity is accomplished if all property within the taxing jurisdiction is assessed at a uniform standard of value, as compared with its actual market value, even though there be great disparity between values as assessed for taxes and the value as fixed in the open markets by barter, exchange, or by buying and selling, and other commercial transactions in which values and prices enter as important factors. The subject relating

to the rule of uniformity has heretofore received consideration by this court in the case of the *State v. Osborn*, 60 Nebr., 415. It is there held that the valuation of property for taxation must be uniform. Says the court in the opinion, at page 419: "There is another cardinal rule of taxation, and that is that 'every person and corporation shall pay a tax in proportion to the value of his, her or its property and franchises.' Constitution, art. 9, sec. 1. And this rule of uniformity applies not only to the rate of taxation but as well to the valuation of property for the purposes of raising revenue. *High School District No. 137 v. Lancaster County*, 60 Nebr., 147. The constitution forbids any discrimination whatever among taxpayers. *State v. Graham*, 17 Nebr., 43; *State v. Poynter*, 59 Nebr., 417. Thus if the property of one citizen is valued for taxation at one-fourth its value, others within the taxing district have the right to demand that their property be assessed on the same basis. The rule of uniformity is satisfied if observed by each jurisdiction imposing the tax. *Jones v. Commissioners*, 5 Nebr., 561; *Turner v. Althaus*, 6 Nebr., 54; *Pleuler v. State*, 11 Nebr., 547." In *State v. Karr*, 64 Nebr., 514, in speaking of the case from which we have just quoted, it is said by the author of the latter opinion: "From the context and the subject-matter being considered, it is manifest that the doctrine intended by the court was that when the property generally in the city is assessed at a certain proportion of its actual value any person whose property is assessed at a greater proportion of its actual value has ground for complaint, and so, when the property of one person is assessed at a less proportion of its value than the proportion of value at which property in general in the city is assessed, any taxpayer who is injured thereby has cause of complaint." See, also, *Bureau County v. Chicago, B. & Q. R. Co.*, 44 Ill., 229, where it is held that the rule of uniformity of taxation prescribed in the constitution requires that one person shall not be compelled to pay a greater proportion of the taxes, according to the value of his property, than an-

other; that uniformity, as a vital principle, was the dominant idea of the constitution relative to the assessment of property and levy of taxes thereon for revenue purposes. From the foregoing it is altogether clear that in the discharge of the duties incumbent on the state board of equalization as an assessing board it was the duty of the members thereof, or a majority of them, to, in the manner and by the methods pointed out by the legislature, ascertain the fair and reasonable value of all of the properties of whatsoever kind owned by the corporations subject to taxes in this state, which it was their duty to assess, and to value such properties for the purposes of taxation so that the owners thereof should be required to pay a tax in proportion to the value of their property uniform, so nearly as was practicable, with the standard of values generally placed on all other species of property throughout the state, which is assessed by the different assessing officers selected for that purpose in the manner provided by law. It would be unfair to the railroad corporations to assess their properties in this state at a greater valuation than that which prevails in the assessment of property generally, and it would be unjust to the great body of taxpayers paying taxes within the state were the values for assessment purposes of the railway companies so disproportionately low as to permit them to escape their just and fair proportion of the taxes needful for the public revenues.

In the first return made by the respondents it was admitted by them that they had not assessed the franchises of the different corporations whose properties it was their duty to assess, for the reason that they did not believe they were possessed with the authority and power to assess such franchises. In the amended return which supersedes the first one, and from which we have quoted, they allege in detail what action was taken, and from these allegations in the amended answer and the evidence in support thereof we are asked to conclude, as a matter of law, that the franchises of the different corporations whose proper-

ties were valued by them were considered, valued and actually assessed with the tangible property all as a unit or as one property, and that in truth all of the properties of said corporations, both tangible and intangible, subject to taxation were comprehended and included in the assessment actually made, and that the values they arrived at were the fair values of all of such properties for taxation purposes. We have been favored with exhaustive briefs on the question involved in the controversy on the part of counsel for relators and by counsel on behalf of respondents, who represent the important railway systems of the state, and who appear *amici curiæ*. Since the filing of the amended return to the alternative writ, no difference of opinion appears to exist between any of the numerous counsel as to its being the duty of the board of equalization to assess all properties of the railroad companies and the other corporations mentioned, whether it be tangible or intangible,—whether physical property, such as road-bed, right of way, rolling stock, improvements in the way of depots or other like property used in the operation of such railways, or intangible, such as franchises or other elements of property of an incorporeal character. It is conceded, if we understand counsel for respondents aright, that the duty devolves on the state board of equalization to ascertain the value, and assess for revenue purposes all properties of the railway and telegraph companies, both tangible and intangible, subject to taxation in this state; and that if in fact the board has failed to assess and omitted from consideration the franchises of the different corporations whose property they are required by law to assess, a cause of action has been stated and established by the evidence on the part of the relators, and that a writ should accordingly issue as prayed.

Whatever may have been the views heretofore entertained as to what elements or factors should be considered and taken into account in the assessment of the property of railway and telegraph companies, it is now the

firmly established rule that franchises and other rights, privileges and obligations having the elements of property of an intangible character, are subject to valuation and assessment in like manner as the physical properties belonging to such corporations, such as road-bed, ties, iron, depots, rolling stock, etc. Says the United States supreme court: "That the franchise, capital stock, business, and profits of all corporations are liable to taxation in the place where they do business, and by the state which creates them, admits of no dispute at this day. 'Nothing can be more certain in legal decisions,' says this court, in *Society for Savings v. Coite,* 6 Wall. [U. S.], 594, 606, 'than that the privileges and franchises of a private corporation, and all trades and avocations by which the citizens acquire a livelihood, may be taxed by a state for the support of the state government.' *State Freight Tax Case,* 15 Wall. [U. S.], 232; *State Tax on Railway Gross Receipts,* 15 Wall. [U. S.], 284." *State Railroad Tax Cases,* 92 U. S., 575, 603, 23 L. Ed., 663. The constitution in express terms provides that franchises of corporations are subject to taxation. They would no doubt be so regarded without this express provision, as coming within the meaning of the word "property." The legislature has provided for the assessment of all such property of corporations generally by requiring the listing of the capital stock of such corporations, which, with the funded indebtedness, would ordinarily represent all of the property of such corporations, both tangible and intangible, the latter being ascertained by separating tangible property from the whole of the property of such corporation as represented by its capital stock and funded indebtedness. *State v. Karr,* 64 Nebr., 514.

With respect to the property of railroad, telegraph, sleeping and dining car companies subject to taxation in this state, the legislature, in its wisdom, has provided a plan or scheme of assessment not common to other species of property on which taxes are levied and assessed. By section 39 of the revenue act it is made the duty of the

principal accounting officers of the corporations mentioned to furnish certain information as therein prescribed, and to list and return to the auditor of public accounts certain described property, therein mentioned, owned by the companies within this state on the 1st day of April of the year in which the assessment is made. It is further provided by section 40, that if the information required by the preceding section is not received by the time specified, the auditor shall proceed to obtain the facts and information called for in any manner that may appear the most likely to secure the same correctly, which shall be considered together with such other obtainable reliable information as the board may be able to procure; and that as soon as practicable after receiving such information, a meeting shall be held by the state board of equalization, and an assessment made of all of such corporate properties for the purpose of levying taxes thereon, and the same apportioned to the different cities, counties, townships and other political subdivisions in proportion to the mileage of railroad or telegraph lines situated within such subdivisions. Section 32 of the revenue act has been considered and construed by this court in the case of *State v. Karr, supra,* and it is now contended by the relators that the provisions of this section are applicable, and should be complied with in assessing the properties required to be assessed by the state board of equalization; that in addition to the information required by sections 39 and 40, all of the corporations assessed by the state board of equalization should be required to make a return in conformity with the provisions of section 32 with respect to the capital stock of such corporations, and that the state board of equalization should then assess the intangible property of such corporation as thus returned, as contemplated by said section. Such a contention, in our judgment, can not be upheld. The provisions of section 32, we think, apply only to the property of those corporations required to be listed and returned for assessment purposes and to be assessed by local assessors,

selected to assess property generally in the different coun
ties in the state. The purport and effect of the provisions
of section 32 is to require the listing and assessment of all
the property of the corporations coming within its pro-
visions in two separate classes. It is obvious that the leg-
islative intendment was to have all the tangible property
of such corporations assessed as other tangible property,
and that the value of the remainder or the intangible prop-
erty of the corporation assessed was to be ascertained by
finding the value of its entire property as represented by
its capital stock, and then, by deducting the value of the
tangible property assessed in the ordinary way, its in-
tangible, or that which was represented by its franchise,
rights and privileges, should be assessed as a separate and
distinct item of property. The capital stock represents
the corporate estate, whether tangible or intangible. The
rule is well settled to the effect that a tax upon capital
stock of a corporation is, in effect, a tax upon the property
and assets of such corporation. *Massachusetts v. Western
Union Telegraph Co.,* 141 U. S., 40; *Pullman's Palace Car
Co. v. Commonwealth,* 107 Pa. St., 156. It thus appears
that in assessing the property of the corporations enumer-
ated in section 32, and to which its provisions are appli-
cable, the real estate of such corporation is assessed as one
item of property; the personal property, as the term is
ordinarily understood, as another; and the remainder of
the corporate estate, or the intangible property, including
its franchise, is thereupon assessed and taxes levied
thereon, the value thereof being ascertained by deducting
from the total value of its capital stock the assessed value
of the real and personal property, the remainder repre-
senting the property and assets of the corporation subject
to taxation, and not included in the two first items men-
tioned. This method of procedure, as we shall hereafter
see, is not applicable, nor was it intended by the legisla-
ture to be followed, in the assessment of railroad and
other corporate properties which it is made the duty of
the state board of equalization to assess. A careful con-

sideration of the provisions of sections 39 and 40, in connection with those of section 32, necessarily leads to the conclusion that the legislative method of ascertaining values, and of making an assessment are quite different. Instead of the property being classified, as in section 32, it is provided in section 40 that "all such property shall, for the purpose of taxation, be deemed 'personal property.'" Sections 39 and 40 embrace within themselves, as was evidently the intention of the legislature, a complete plan and scheme for the assessment of railroad and other corporate properties therein mentioned, and entirely independent of the provisions of section 32. These two sections obviously contemplate the valuation and assessment of the whole of the property of each railroad and telegraph company, assessed as a unit, or in its entirety, on a mileage basis. It certainly can not be successfully contended that the real estate of such corporations should be assessed as one item, personal property as another, and the intangible property separate from the other two, as is provided shall be done by the language of section 32. On the contrary, it seems reasonably clear that in assessing railroad and telegraph property as contemplated by sections 39 and 40, the whole property belonging to any one corporation, and subject to assessment in this state, should be valued for tax purposes in its entirety, and that in such valuation should be included all elements going to make up the entire property, whether consisting of franchises or other intangible property, or physical property, be it real, personal or mixed. By section 40 it is provided in express terms that the property of all such corporations shall be valued and assessed by the state board of equalization at its actual value for each mile of road or line which is assessed, the value of each mile to be determined by dividing the sum of the whole valuation ( i. e., the value of the whole property as a unit) by the number of miles of such road or line. Had the legislature intended that the state board of equalization should be governed in assessing railroad properties by the provisions of section 32, it would no doubt have so

expressed itself in apt terms, and would have provided for such a return by the corporations to be assessed to the state auditor, with the other information provided for, as is required under the provisions of this section. We have no doubt of the authority of the state board to obtain all the information which could be acquired by listing corporate property for taxation under the provisions of section 32, together with much other useful information pertaining to the subject; but in making an assessment of railroad and telegraph properties, the board, we are satisfied, should be guided by other considerations, and assess all such property as a unit, and at a valuation per mile for all property *en masse* on which taxes are to be levied. The section is incapable of a literal application in the assessment of railroad and telegraph properties. The capital stock of such corporations usually represents property and assets situated in many different states and in several taxing jurisdictions, and to comply literally with the provisions of this section in this state would be utterly impracticable and impossible, for the reason that its capital stock and funded indebtedness would represent its entire property, whereever situated, while that which would of right be subject to taxation here would be that proportion of the capital stock representing the property situated and used in the operation of the railroad or telegraph lines within the state, or only a fractional part of the total intangible property owned by such corporations. In the further discussion of the case our views regarding the intendment of the law as to the valuation and assessment of railroad property as a unit are more fully elaborated. As has been indicated, we are of the opinion that the provisions of section 32 apply to the assessment of corporate properties other than those to be assessed by the state board of equalization, while sections 39 and 40 embrace the legislative plan and method of assessing railroad and telegraph property, which is full and complete within itself, and capable of enforcement entirely independent of the provisions of section 32.

Looking, then, to the provisions contained in sections 39

and 40 of the revenue act for the authority of the state board of equalization to assess the railroad and other corporate properties mentioned, we find, speaking in general terms, that it is the duty of the respondents to secure all reasonable and necessary information, the more important of which it is provided shall be furnished by the officers of the corporations to be assessed, and in default thereof to be obtained by such means as are most likely to secure the correct information, together with such other reliable information relative to the matter as the board may be able to secure; and then to assess the entire property of any one corporation as a unit, or as one property, which is thereafter to be apportioned on the mileage basis throughout the state, and taxes levied thereon, as on all other property, by the proper taxing authorities. In the assessment of such properties, the main object to be accomplished, as has heretofore been stated, is to fix the valuation for taxing purposes with reference to uniformity as regards assessment values generally, so that each corporation assessed shall pay a tax in proportion to the value of its property and franchises. It is immaterial whether the property is physical, tangible or intangible, the prime question being, what is the total value of the entire property of the corporation being assessed, and what should be its value for assessment purposes, so that it shall harmonize with the constitutional rule of uniformity? In determining this value it is the duty of the board to consider all factors having the elements of property, and which enter into and form a part of the total property and assets of the corporation. Whether the property be tangible or intangible, or a valuable privilege or contract right which enhances the value of the corporate estate and adds to its income-earning capacity, it should be considered and taken into account by the assessing board in fixing the total value of the property to be assessed. For this purpose the board is clothed with ample authority and power, and may have recourse to any rational method of acquiring information relating to such property and its value as will best conduce to a correct

ascertainment of the actual value of all such property. Pertinent to the question we are considering are the observations of the United States supreme court in *Adams Express Co. v. Auditor of Ohio,* 166 U. S., 185. It is there said by Brewer, J., who delivered the opinion of the court (p. 218) : "In the complex civilization of to-day a large portion of the wealth of the community consists in intangible property, and there is nothing in the nature of things or in the limitations of the federal constitution which restrains a state from taxing at its real value such intangible property. * * * It matters not in what this intangible property consists—whether privileges, corporate franchises, contracts or obligations. It is enough that it is property which though intangible exists, which has value, produces income and passes current in the markets of the world. To ignore this intangible property, or to hold that it is not subject to taxation at its accepted value, is to eliminate from the reach of the taxing power a large portion of the wealth of the country. Now, whenever separate articles of tangible property are joined together, not simply by a unity of ownership, but in a unity of use, there is not infrequently developed a property, intangible though it may be, which in value exceeds the aggregate of the value of the separate pieces of tangible property. Upon what theory of substantial right can it be adjudged that the value of this intangible property must be excluded from the tax lists, and the only property placed thereon be the separate pieces of tangible property?"

Having indicated in a general way our views as to what factors or elements in the nature of property should be taken into consideration in order that an assessment, when made, should cover and include all property properly assessable to such railroad or other corporation which it is the duty of the state board of equalization to value for taxation, it seems proper, in this connection, to give brief consideration to the methods which may be employed by the assessing board in arriving at a fair conclusion as to a valuation of the property to be assessed, including every-

thing comprehended within the meaning of the term "property" owned by such corporation. We have heretofore spoken of the rule of uniformity as applicable alike to the assessment of all classes of property within the state on which taxes are levied. Regarding the subject, it may be said that no fixed or inflexible rule can be laid down. The assessed value of property for taxation as fixed by assessing boards and individuals selected for that purpose must, in the nature of things, be a matter largely in the discretion of the party making the assessment. A valid assessment can result only in the exercise of an honest judgment as to the value of the property assessed. In assessing property, the value must, of course, be ascertained and arrived at in pursuance of certain established rules and prescribed statutory methods for the determination of the value of all property assessed for the purpose of raising needful public revenues, the chief inquiry and main consideration being, what is the fair and reasonable value of the property assessed, such as would be approved by men of ordinary intelligence, prudence and judgment, who are qualified and competent to speak regarding the matter under consideration? Ordinarily, the fair cash value in the open markets, as fixed by competent evidence, will be a safe guide to measure the value of property for the purposes of taxation, regard being had to the rule of uniformity of which we have made mention. It may be, and probably is, true that much of the property of railroad companies subject to taxation is of such a nature and so situated that in the ascertainment of its value for the purpose of taxation the ordinary methods of determining value, as applied to property generally, are of no practical benefit. A railroad right of way, road-bed, ties, irons and superstructures, all required for the necessary and successful operation of the road and the conduct of the business, are of such character that it would be difficult, indeed, to say what the market value of such property is when determined alone by the consideration of what it would bring in cash if exposed to public sale. There are obviously elements about a railroad prop-

erty, and especially is such the case when we consider
them as vast, industrial enterprises, operating in many
different states, which make it necessary to ascertain the
value of all the property connected with the construction,
operation, and use in its entirety, or as one indivisible
whole.  Such a property can not be separated into broken
parts as it may be located and used in different taxing
jurisdictions and each part assessed as an independent
piece of property.  It is now a well established and ac-
cepted rule that in the assessment of such property, or the
part thereof subject to taxation by one taxing jurisdiction,
it is necessary to consider and determine the value of the
whole property wheresoever situated, and thereafter ascer-
tain the value for the purposes of taxation of that portion
of the whole which is situated and used and subject to taxes
in. the one taxing jurisdiction.  When the value of the
whole property is ascertained, and it is determined what
proportion of the property is situated and used in any one
state, the relation such part bears to the whole of the
property of the entire system may be safely accepted as a
proper guide and standard for the valuation of the prop-
erty of such corporation which may rightfully be made the
subject of taxation within such state.  As to just what will
determine the value of the entire railroad property, a part
of which is to be assessed in any one state or taxing juris-
diction, the courts themselves are not in entire accord.
There are, doubtless, many elements and factors which
conduce to a correct determination of the true value, and
may properly be considered, which have received the ap-
proval of the courts generally.  It is not so important
what the nature of the inquiry is when the question of the
true value of the property is involved.  The property can
have but one true value, whatever may be the purpose of
the investigation.  Whether it be for the purpose of fixing
reasonable rates for the transportation of passengers and
carrying of freight, or for the purpose of taxation, the rule
to be applied in ascertaining the value of the property
should be the same.  If railroad companies insist that their

property is of a certain value for the purpose of determining what are reasonable maximum charges for the transportation of passengers and carrying of freight, they have no ground of complaint if the same property is assessed at the same value for taxation purposes. The same property can not rightfully be valued at one sum for one of the purposes mentioned, and at a different amount for the other. The state is too just in the administration of its laws to insist that railroad property should, for taxation, be considered as of very great value, and for the purpose of regulating rates to be charged by such corporations as common carriers, that the value of the same property is altogether lower. In the case of *Smyth v. Ames,* 169 U. S., 466, 546, known as the "Maximum Freight Rate Case," from this state, Mr. Justice Harlan, who wrote the opinion of the court, says with reference to the reasonableness of rates to be charged by railway corporations as common carriers, that the basis of all calculations "must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience." There is much controversy as to whether stocks and bonds, which ordinarily would represent the total value of the property and assets of a corporation, may properly be regarded as furnishing a true criterion in the ascertainment of the correct value of all the corporate property, both tangible and intangible.

It is insisted, and not without merit, that the values of

stocks and bonds of a railroad corporation are at times, and in many instances, more or less fictitious, occasioned by abnormal conditions, and frequently result from manipulations on boards of trade and in the stock markets; that considerations enter into the market quotations of such stocks and bonds, other than the real and actual worth of the property they represent. While conceding that the market value of the stocks and bonds of a railroad corporation may not always furnish the best evidence, or the exclusive criterion of the value of the corporate property, it can not, we think, be gainsaid that the amount and value of such stocks and bonds, if not subject to extraneous influences, would very generally, if not uniformly, be a most important factor in the determination of the value of the corporate property which they represent, and should receive due consideration, with other pertinent evidence, in reaching a correct conclusion as to the actual value of such property. The corporation is possessed of a vast property, extending through different states, of a great variety of character. Its capital stock, held by different holders subject to the bonded indebtedness, represents the proportions of the entire property held by each, and the total value of the stocks and bonds should ordinarily represent the entire corporate estate, for which it stands. "Shares in a corporation" says Mr. Morawetz "represent fractional interests in the entire corporate concern, and their value necessarily depends upon the real capital which the company owns." 1 Morawetz, Private Corporations, sec. 288. This is evidently the view entertained by the legislature of this state in the enactment of section 32 of the revenue act, requiring the capital stock of other corporations than those assessed by the state board of equalization, to be valued and assessed for tax purposes at the actual value less the value of the tangible property of such corporations on which taxes are assessed and levied as such.

In a late case decided by the United States circuit court for the northern district of Illinois (*Chicago Union Trac-*

*tion Co. v. State Board of Equalization,* 114 Fed. Rep.,
557), a rule is announced which eliminates entirely the
market value of stocks and bonds, and fixes the value of the
corporate property by capitalizing the net income at an
interest-bearing rate of six per cent. The rule is thus an-
nounced : "The value of the capital stock of a corporation
and its franchise for the purpose of taxation is determined
by ascertaining the true net earnings, which is the gross
earnings reduced by the annual expenditures, increased
debts, and the current depreciation in its tangible property,
and by capitalizing such net earnings at the ratio of 6 per
cent., and equalized to the assessment of the other prop-
erty of the state." The proposition is somewhat novel and
probably will not receive judicial sanction generally.

In a leading case involving the consideration of the sub-
ject, the supreme court of the United States, speaking
through Miller, one of the then justices, has said : "It may
be assumed for all practical purposes, and it is perhaps
absolutely true, that every railroad company in Illinois has
a bonded indebtedness secured by one or more mortgages.
The parties who deal in such bonds are generally keen and
far-sighted men, and most careful in their investments.
Hence the value which these securities hold in market is
one of the truest *criteria,* as far as it goes, of the value of
the road as a security for the payment of those bonds.
These mortgages are, however, liens on the road, and, tak-
ing precedence of the shares of the stockholder, may or
may not extinguish the value of his shares. They must in
any event affect that value to the exact amount of the ag-
gregate debts. For all that goes to pay that debt and its
interest diminishes *pro tanto* the dividend of the share-
holder and the value of his share. It is therefore obvious,
that, when you have ascertained the current cash value of
the whole funded debt, and the current cash value of the
entire number of shares, you have, by the action of those
who above all others can best estimate it, ascertained the
true value of the road, all its property, its capital stock,
and its franchises; for these are all represented by the

value of its bonded debt and of the shares of its capital stock." *State Railroad Tax Cases,* 92 U. S., 575, 604.

In the case of *State v. Jones,* 51 Ohio St., 492, which later on was followed by the United States supreme court, it is said regarding the same subject: "But the property of a corporation may be regarded in the aggregate, as a unit, an entirety, as a plant designed for a specific object; and its value may be estimated not in parts, but taken as a whole. If the market value—perhaps the closest approximation to the true value in money—of the corporate property as a whole, were inquired into, the market value of the capital stock would become a controlling factor in fixing the value of the property. Should all the stockholders unite to sell the corporate plant as an entirety, they would not be inclined to sell it for less than the market value of the aggregate shares of the capital stock. Besides, while the amount of the capital stock may be limited by the charter and the laws governing it, the real and personal property of the corporation may be constantly augmented, and may keep pace with any increase in the value of the capital stock. The market value of the capital stock, it is urged, has no necessary relation to the value of the tangible property of the corporation. But such is the well understood relation between the two, that not only is the value of the capital stock an essential factor in fixing the market value of the corporate plant, but the corporate capital or property has a reflex action on the value of the capital stock." To the same effect are *Cleveland, C., C. & St. L. R. Co. v. Backus,* 154 U. S., 439; *Sanford v. Poe* [*Adams Express Co. v. Ohio*], 165 U. S., 194, and the same case on rehearing, 166 U. S., 185. And this court has also indirectly expressed itself as being in accord with these same views in the recent case of *State v. Karr, supra.*

From what has been said we do not wish to be understood as saying that a valid assessment may not be made without resorting to the method of ascertaining the value of the entire property we have herein last discussed. There are, no doubt, other avenues of information, and other

factors proper to be considered; and when so considered
in the assessment of the property of a railroad company,
both tangible and intangible, and all such property is in
fact considered, valued and assessed for the purpose of
taxation, such an assessment can not be treated as a null-
ity, nor can the deduction that property has been omitted
which it is the duty of the board to assess properly be made.
It is said that a sound and practical basis for the assess-
ment of railroad property may be reached by other means
than that of ascertaining the market value of the bonds
and stocks of such corporation.  It is done, says Clark,
district judge, · "by determining what it would cost to
reproduce the property in its present condition, and at its
present value, and to this is added the value of the fran-
chise, which may be ascertained by looking to the actual
earnings of the property as a basis; for it is this which
shows the true value of the franchise and its use in con-
nection with all of the tangible property.  The stock and
bond basis is liable to be erroneous and misleading in other
practical particulars, which I will not stop to point out.
When we come to actual earnings, a sensible and safe ele-
ment is reached, which may be properly regarded in deter-
mining actual, as distinguished from purely speculative,
values on property.  Earnings, however, furnish a safe
basis on which to estimate values only when net earnings
are considered.  Indeed, no just result can ever be had by
treating any element in a method of figuring on paper only.
It is familiar knowledge that properties of this kind are
operated at an enormously great expense, when compared
with the operating expenses of other classes of property;
and in a given case the gross earnings and receipts might
be large, while nothing whatever would be left as a net
result to pay a dividend or interest on the property actu-
ally invested, after deducting proper charges." *Railroad
and Telephone Cos. v. Board of Equalizers of Tennessee,*
85 Fed. Rep., 302, 313.  While the views thus expressed
do not meet our unqualified approval, it may be said that
the earnings of a railroad company is evidence of a most

important character in determining the true value of the property from which the earnings accrue, that this is the chief element which gives value to property, and should be considered, in connection with other available and pertinent facts, in determining the value of the entire corporate property. Says Mr. Justice Brewer in *Cleveland, C., C. & St. L. R. Co. v. Backus,* 154 U. S., 439, 445: "The rule of property taxation is that the value of the property is the basis of taxation. It does not mean a tax upon the earnings which the property makes, nor for the privilege of using the property, but rests solely upon the value. But the value of property results from the use to which it is put and varies with the profitableness of that use, present and prospective, actual and anticipated. There is no pecuniary value outside of that which results from such use. The amount and profitable character of such use determines the value, and if property is taxed at its actual cash value it is taxed upon something which is created by the uses to which it is put." In the case at bar it is the contention of the respondents that while they refused to assess franchises of the different corporations assessed separate and apart from the tangible property, they did in fact assess all such property, both tangible and intangible, and for that reason the writ prayed for ought not to issue. In the amended return it is averred that the board "considered the fact that said companies and each of them were actually engaged in using and operating all of their properties in the performance of the duties incumbent upon them and each of them by law to perform, and in transacting the business for which they, and each of them, were incorporated; and also considered the revenues and earnings of said companies from the use and operation of their several properties; and thereupon, after full consideration of said matters, each of the properties of said respective companies was valued as a unit for said purposes of assessment and taxation." We have seen that the property should be assessed as a unit; and if, in making such assessment, the board omitted no property which it was required to assess,

we can not issue a writ requiring them to do that which they have already done, even though the court be of the opinion that the method adopted by the assessing board in arriving at such conclusion is not the one best calculated to produce more nearly the most accurate result as to a true and fair valuation of such property. If the board acted honestly, if it assessed the intangible with the tangible property, if the allegations in the amended return are sustained by the evidence, then such return is conclusive of the controversy, and a peremptory writ of mandamus can not issue. It is fairly to be deduced from the testimony relative to this point that the board acted largely on the prior assessments of railroad property, without entering into any very extended and exhaustive investigation of the subject on its own behalf, and was in a marked degree guided by such prior assessments. It is also testified, and is no doubt true, that the earnings of the different roads, as shown by the returns made to the state auditor, were considered as material factors, and were taken into consideration by the board in reaching the valuation placed on the different properties for assessment purposes. The only inference deducible from the evidence is that in valuing and assessing the tangible property of the corporations assessed the board took into consideration and were influenced in their action by the fact that it was property being used in the operation of railroad and telegraph companies, was earning an income, and being made the means and instrumentality for effectuating the purposes and accomplishing the objects for which the companies were organized and doing business; that the railroad companies were transporting passengers and carrying freight for hire, and exercising the rights, powers and privileges of corporations organized for the purpose of engaging in business as common carriers; that the telegraph companies were likewise engaged in a business of a public nature, charging for the services rendered the public, and earning revenues from such business. It is obvious that considerations of the character mentioned include and comprehend the elements

which go to make up the entire property and its value, both tangible and intangible. If the assessment is made of all the physical property when considered in connection with the uses to which it is put and the earnings it is capable of producing, and the whole is valued and assessed as one entire property, then such an assessment must necessarily include the value of the franchise and other intangible property, as well as the tangible. Such a valuation would be that which it has as used, and by reason of its use. It would include the franchises, which give to the physical property an added value, which it would not otherwise possess, because of the uses to which it is put, and the profitableness of such use. It is evident, from an examination of the evidence, that the board valued and included in its assessment property other than the naked physical property, because of the changed valuations placed on different lines, which can not be satisfactorily accounted for when we consider alone the difference in value of the respective physical properties. The main line of the Union Pacific Railroad Company from Omaha to the western boundary of the state, and what is termed the main line of the Burlington & Missouri in this state from Plattsmouth to Kearney, are assessed at near $10,000 per mile, while many other lines of road are assessed at much lower sums, when, if the values of the physical property only are considered, the assessment values per mile should be much nearer together. Again, there is evidence tending to show what amount it would take to replace the physical property of different roads which were assessed, or, in other words, the cost of construction; and if, in assessing such properties, no regard was had to the value of the franchises, it is obvious that the board's valuation placed on the physical properties alone can not be sustained, as the inference is unavoidable that such valuation was grossly unfair and unjust to the railroads, and so lacking in uniformity with valuations placed on property generally as to conflict with the constitutional provisions in that regard, and necessitate the vacation of the entire assessment.

It ought not to be presumed that the board of equalization, in assessing the different railroad properties, valued the same for tax purposes at sums much greater and grossly disproportionate to the standard of valuation for similar purposes prevailing generally, and we are not warranted, from the record, in assuming such to be the case. From an examination of the entire record the fair inference warranted therefrom is that the assessment complained of was made on the entire property of the railroad companies assessed, both tangible and intangible, and that the franchises were included in the assessment so made; that the whole property—that is, all that goes to make up values and determine the worth of the corporate property when considered in its entirety—was included in the assessment actually made. A peremptory writ can not, therefore, rightfully issue to compel the respondents to assess the franchises of the different railroads because omitted from the assessment of the tangible property by them valued and assessed for taxation purposes.

It remains to be considered whether, in making the assessment of the corporate properties they were required to assess, the board acted in such manner as to warrant us in deducing from the record that they acted fraudulently, and in wanton disregard of the law and the rights of the taxpayers generally; whether, in the performance of the duties it was incumbent upon them to discharge, they disregarded the law, ignored established rules and methods, which should be conformed to in the assessment of such properties, and thereby vitiated the action taken. It is the contention of relators that in making such assessment the board grossly and knowingly violated their duty to the people and to the relators by disregarding the plain provisions of the constitution and laws of the state, and because thereof, the assessment made by them was invalid, and in law no assessment, and that they should be required to reassemble, and assess such property as by law required. This contention is predicated on the claim that the board proceeded in an irregular manner, and failed and refused

to take into consideration information and facts essential in arriving at a fair valuation of the property to be assessed, and that the values placed thereon are so much below the standard of values for assessment purposes prevailing generally in this state as to all other property assessed for taxes, as to raise a presumption of fraud sufficient to invalidate the assessment so made.

The proper limits of a judicial opinion such as we are preparing forbid us from entering into a detailed discussion of the evidence in the case at bar as presented by the record bearing on the question of the true and correct valuation of the railroad property which it was the duty of the state board of equalization to assess. There is in the evidence submitted for our consideration a great volume of figures and other information touching the subject in a variety of ways, and offered for the purpose of elucidating the problem, and demonstrating what is a proper valuation of the railroad properties in this state subject to taxation. The more important of such evidence relates to the physical properties of the different railroad companies, the cost of construction and reproduction, the mileage, and the earnings, both gross and net, together with the stock and bonded indebtedness and the value thereof, as disclosed by quotations from the market reports. The valuations of the same property, as assessed by the state board of equalization for many years prior to the present year, have been introduced in evidence. The relators argue that while the value of all railroad properties in the state has increased at a very great rate in recent years,—the stocks of such corporations almost doubling in value,—the value of such property as fixed for assessment purposes by the respondents is substantially the same as it was five or six years ago, when many railroads were bankrupt, and in the hands of receivers. It is said that whereas, during the depression in the business world of a few years ago, when property of every kind was shrinking in value, and had reached its lowest ebb, and railroad stocks were worth in many instances but a few cents on the dollar, that now

stocks representing the same property have increased to par value, and often far above, reaching in some cases to a valuation nearly double that called for on its face. It is earnestly insisted that because of the marked increase in the market value of railway stocks and securities, and a corresponding increase in the value of the property represented by such stocks and securities, and the greatly enhanced earnings in recent years of all of such properties, that the assessment thereof for taxation must, in fairness to all taxpayers, be increased far beyond the value placed thereon by the respondents. It is conceded by counsel for respondents that there has been a noted increase in the value of railroad properties in this state, as a whole, in recent years, although the mileage has remained substantially the same; but it is insisted that taxable property generally throughout the state, both real and personal, has increased in value, and approximately at the same ratio, and yet values as fixed for assessment purposes have remained almost stationary, and that because thereof, and in order that the constitutional rule of uniformity be not violated, the assessed valuation of the railroad properties, which it is sought to impeach, is as it should be, and can not be overturned for the purpose of having a higher valuation placed thereon without resulting in the railroad companies being compelled to pay more than their fair and just proportion of the public revenues. The position of the respondents is that in observing the standard of valuation placed on property generally they could not place a different valuation on railroad and telegraph property without violating the rule of uniformity. Illustrating this line of argument, brief reference may be made, in a general way, to the relative values of railroad with other taxable property as returned by the taxing authorities which is drawn from the evidence introduced in this case. In the gradual development of the state it is but natural that under normal conditions there should be a gradual increase in the value of all property listed and returned for assessment purposes. In the year 1890 the assessment of

railroad property reached in the aggregate, its highest valuation. There were in that year assessed 5,157.57 miles of railroad property at an average valuation per mile of $5,788.42. The value of other property as assessed that year amounted in the aggregate to the sum of $154,916,-083.49. In 1893 the value of all property returned and assessed for taxes exclusive of railroad property had reached the aggregate sum of $166,158,986.73. From 1890 to the year 1896, there was a gradual reduction in the total assessed value of railroad property of $4,429,513.05, so that in the year last mentioned there were assessed 5,242.39 miles of railroad property at an average valuation per mile of $4,585.51. This marks the lowest value per mile since the year 1890. The total value of all other property returned for taxation in the year 1896 had likewise undergone a decrease in value, so that in that year it amounted in the aggregate to the sum of $141,653,762.37. In 1897 the aggregate value had further decreased to the sum $139,632,-015.72. Since the year 1896 there has been a gradual, though light, increase in the valuation of railroad property. In 1901, 5,706.32 miles were assessed at an average valuation per mile of $4,653.96. All other property was assessed as of the aggregate value of $148,016,363.19. The assessment in question for the year 1902 was upon a mileage of 5,703.32, and at an average valuation per mile of $4,694.63. The complete returns of the assessment of all other property had not been received when this case was tried, but in the estimation of a witness in the auditor's office, who testified during the trial, from such information as was then in his hands, it was his judgment that there would be an increase of from three to five millions, including the increased assessment of railroad properties, over the total assessment for the year 1901. It may be presumed that public officers charged with the performance of a specific duty discharge the same, in the main, in conformity with law. It may be said that assessing officers have undertaken to assess property on which taxes are to be levied so that each person or corporation assessed

should contribute his or its just proportion of the taxes needful for the public revenues. The comparative figures we have just given are useful, and have probative value in determining the relative value, as judged by many different officers, covering a long period of time, between the property of the railway companies doing business in this state and subject to taxation therein, and all other classes of property listed and returned for the purpose of taxation, and therefore assist in the determination of the question under consideration as to a proper valuation of the railroad properties of the state for assessment purposes for the current year.

Another vital point in the controversy, and regarding which there exists among counsel a radical difference of opinion, is in relation to the proper basis or standard of valuation for the assessment of property by the state board of equalization in order to conform to the standard of valuation employed generally in the assessment of other property. We have noted heretofore that while the law contemplates the assessment of property at its fair cash value, a wide departure from this requirement has gradually grown up, so that now property is assessed at a valuation of but a fraction of its true and actual value. Counsel for respondents have in their presentation of the subject insisted that the relative value or standard for assessment purposes, as compared with the actual cash value, is in the ratio of one to ten; that is, that property is assessed on the average in this state at only about one-tenth of its fair cash value. On the other hand, the relators contend that the standard of valuation for assessment purposes is one-sixth to one-seventh the value which the property would bring for cash in the open markets. It will thus be seen that the view-point occupied by the observer makes a vast difference as to what is the proper valuation of railroad property for assessment purposes, regard being had to the very just rule that valuations should be uniform, and thus all property be required to bear its just proportion of the public taxes. It would be futile, as will hereafter be seen,

for us to undertake to determine with any degree of nicety what is the true standard of valuation of property as generally returned and listed for purposes of taxation. We can only inquire into the matter for the purpose of determining whether respondents, in assessing the properties which it was their duty to assess, have expressed an honest judgment as to assessable values, upon sufficient information, or whether the method pursued in ascertaining and fixing the value of the property assessed was in such wanton and reckless disregard of their duties as to warrant the conclusion that they acted fraudulently. It is not within the province of this court to review the assessment made by the board, and to raise or lower it as equity and good conscience might seem to require. We can only determine whether the board has proceeded in a legal manner and, if so, we can not direct further action, even though we may disagree with the conclusion reached, or regard the method of procedure as not the most appropriate and best calculated to secure with the greatest certainty and accuracy a true valuation of the property assessed. If they have acted by assessing all the property it is their duty under the law to assess, and have proceeded in such manner that it can not be said they have acted fraudulently in that which they have done, the court is powerless to correct the error, even though it be conceded that the assessment as made is lower than in justice it should have been. By the laws of the state, the respondents, as its officers, are constituted a special tribunal or assessing board, charged with the duty of assessing railroad and other corporate properties mentioned in the statute, over which they are given exclusive jurisdiction for that purpose. They are required to assess all such properties at a valuation so that the corporations assessed may be required to pay their just proportion of the taxes needful for the public revenues. In performing the functions allotted to them, and making such assessment, in the very nature of things they are invested with certain discretionary powers requiring the exercise of an honest judgment as to the proper valuation

to be placed on such property for assessment purposes; and with such discretion, when exercised honestly and in good faith, the courts can not interfere. It will hardly be contended that the court can be appealed to for the purpose of trying the question of whether any individual assessor of the thousands throughout the state has valued a particular piece of property which he is required to assess at its true valuation, to be determined by some approved scientific test or method. If the assessor acts honestly, if he exercises his best judgment, and actually assesses the property, and there is no element of fraud in what he does, an assessment so made must stand (except as it may be reviewed and equalized by the properly constituted authorities in the manner provided by law), even though, by the application of the most correct and certain tests, the property so assessed was valued above or below what in truth and justice it should be. The state board of equalization, it must be admitted, is an administrative body, clothed with *quasi*-judicial powers in regard to the assessment of property it is by law required to value and assess. It has the right to exercise a fair discretion in expressing its judgment as to the valuation of such property; and when it has once acted, and there is no fraud shown, its judgment can not be controlled by the writ of mandamus.

In a contest involving the validity of an assessment on the ground that it was grossly unfair and a fraudulent discrimination in favor of certain classes of property assessed, it is said by Mr. Justice Brewer, in speaking for the court in the case of *Maish v. Arizona,* 164 U. S., 599: "There is nothing tending to show that the board, in fixing the value of cattle at $7.42, acted fraudulently or with any wrongful intent, or that that valuation was not the result of its deliberate judgment upon sufficient consideration and abundant evidence, and it would be strange, indeed, if an assessment could be set aside because a single witness is found whose testimony is that the valuation was excessive. No assessment could be sustained if it depended upon the fact that all parties thought the valuation placed by the assess-

ing board was correct. Something more than an error of judgment must be shown, something indicating fraud or misconduct. It appears from the testimony of one of the members of the equalization board that it was guided largely by the valuation placed in other states and territories upon railroad property, and that from such valuation as well as that given by the railroad company, it made the assessment at something like the average of the valuation of railroads in the various states and territories named. It is unnecessary to determine whether this board erred in its judgment as to the value of this property, whether it would not have been better to have made further examination and taken testimony as to the cost of construction, present condition, etc. Matters of that kind are left largely to the discretion and judgment of the assessing and equalizing board, and if it has acted in good faith its judgment can not be overthrown. *Pittsburgh, C., C. & St. L. R. Co. v. Backus,* 154 U. S., 421, 435."

In the last case cited the court observes: "Whenever a question of fact is thus submitted to the determination of a special tribunal, its decision creates something more than a mere presumption of fact, and if such determination comes into inquiry before the courts it can not be overthrown by evidence going only to show that the fact was otherwise than as so found and determined. Here the question determined by the state board was the value of certain property. That determination can not be overthrown by the testimony of two or three witnesses that the valuation was other than that fixed by the board. It is true such testimony may be competent, and was received in this case because, taken in conjunction with other testimony, it might establish fraudulent conduct on the part of the board sufficient to vitiate its determination."

In a case somewhat analogous, where state officers were invested with certain discretion involving the exercise of judgment in the performance of their duties, it is observed by this court in *State v. Kendall,* 15 Nebr., 262, 267, after stating facts as they appeared from the record:

"This being so, it is very clear that no court has the right, by the writ of mandamus, to interpose its judgment, to direct or influence their action. To do so would be usurpation. The only acts which courts can rightfully control by this writ are such as are purely ministerial, and with which nothing like judgment or discretion is connected. *United States v. Seaman,* 17 How. [U. S.], 224, 230; *United States v. Guthrie,* 17 How. [U. S.], 284; *State v. Fairchild,* 22 Wis., 110; *People v. Contracting Board,* 27 N. Y., 378. Though they may require inferior tribunals to exercise judgment given them, or to proceed to the discharge of any of their functions, they 'can not control judicial discretion.' Code of Civil Procedure, sec. 645."

Authorities in great number might be cited in support of the rule announced, but it will serve no useful purpose.

Whether it be an assessing officer or the state board of equalization, authorized to perform the same functions in respect of certain property, and for that purpose exercise the same powers, the action taken calls for an exercise of judgment involving necessarily a reasonable discretion or latitude as to the value of the property assessed. Such an officer or board acts in a *quasi*-judicial capacity in valuing the property over which they have jurisdiction, and presumably act fairly and impartially in fixing such valuation. *Dixon County v. Halstead,* 23 Nebr., 697; *State v. Dodge County,* 20 Nebr., 595. The only safe and sound principle that can be applied is that when the board has once acted, has expressed an opinion of a judicial nature as to the value of the property regarding which action is had, such action can be attacked or impeached only for fraud, or such gross irregularity as amounts to a fraud, showing a wanton disregard of the law, with the evident intention of discriminating in favor of or against certain of those who are affected as taxpayers by the action so taken. It can not, we think, be said that the record warrants us in drawing the inference that the assessment made by the state board of equalization may successfully be impeached for fraud, declared void and equivalent to no as-

sessment, nor that the valuation placed on the property assessed is so low as to clearly show that it is fraudulent, and intended as a discrimination in favor of the railroad companies. Were the record such as to justify the inference that the assessing board disregarded well-known rules for the valuation of the railroad and other corporate properties which it was its duty to assess, including the franchises and other intangible property, and refused and neglected to consider important and reliable information from which the correct valuation of such properties might be ascertained, and assessed such properties at a grossly inadequate sum, and thereby violated the rule of uniformity, which requires that all property shall be assessed by valuation at such sum as to require each owner to pay his or its just proportion of the taxes necessary for the public revenues, then it can not be doubted that an assessment so made would and should be adjudged to be void, and a writ of mandamus issue, compelling action in the manner provided by law. In the recent case of *State Board of Equalization v. People,* 61 N. E. Rep. [Ill.], 339, 342, it is said by the supreme court of that state: "We have repeatedly held that an assessment may be impeached on the ground that property has been fraudulently assessed at too high a rate. In *Hotel Co. v. Lieb,* 83 Ill., 602, we say (page 609) : 'Where  *  *  *  the valuation is so grossly out of the way as to show that the assessor could not have been honest in his valuation—must reasonably have known that it was excessive—it is accepted as evidence of a fraud upon his part against the taxpayer, and the court will interpose.' And in *Railroad Co. v. Cole,* 75 Ill., 591 [on page 594] : 'Valuations must be the result of honest judgment, and not of mere will.' The converse of the proposition must be true, and an assessment may be impeached where the assessment has been fraudulently made at too low a rate. While it is true that fraud will not be presumed, and that the decision of the state board of equalization in fixing the value of corporate property for the purpose of taxation is *quasi*-judicial in its nature, still, when it is apparent to

the court that every well-known rule for the valuation of
capital stock, including franchises, has been violated and
arbitrarily disregarded by the board, and such board has
refused to consider the statements as to values prepared by
the assessors, under the statute, for its use, and has refused
to consider information as to the value of such corporate
property submitted to it by interested parties, and has
arbitrarily fixed such assessments at a grossly inadequate
sum under rules passed by it for the occasion, the court is
justified in holding that fraud in the making of such as-
sessments has been established, and such pretended assess-
ments may be properly disregarded and treated as no as-
sessments, and such board be coerced by the writ of
mandamus to assess such property." It can not be fairly
inferred from the record before us, as we view it, and treat-
ing the pleadings as charging the state board of equaliza-
tion to have acted fraudulently, that the board acted from
improper motives, and with the object of unlawfully dis-
criminating in favor of the railroad companies whose
property it assessed. We are not warranted in saying that
the respondents, with the intention of perpetrating a fraud
upon the taxpayers generally, assessed the railroad prop-
erties coming under their jurisdiction at a grossly inade-
quate valuation, or that they wantonly or purposely dis-
regarded all information from which a just valuation could
be determined. They may have erred, and the judgment
exercised in placing a valuation on the property assessed
may not have been that which would meet the approval of
disinterested and unbiased parties competent to judge of
the valuation of such property. They adopted a method
regarding the assessment of railroad properties which, in
the main, has been in vogue in this state for many years.
They doubtless endeavored, in the light of the information
before them, to assess the railroad and other properties
which they were required to assess at a valuation which
would be just, and in proportion to the standard of value
of property generally throughout the state, as fixed and
determined by the assessors thereof. If the judgment thus

exercised is not, in fact, the best, or if the property assessed was valued below that which it justly should be, yet, if the board pursued methods reasonably well calculated to reach the desired result, and exercised an honest judgment in valuing the property, the assessment can not be overturned.

In the original answer to the alternative writ filed by the respondents it was admitted, in substance, that the franchises of the different railroads were not assessed because the board believed it was not possessed with authority and power to assess such franchises, and that it had assessed only the physical or tangible property of such railroad companies, and prayed the judgment of the court as to its right to assess the franchises of such railroad companies. This answer, as we have seen, was, before trial, superseded by an amended return, in which it was alleged that the whole of the properties, both tangible and intangible, of such railroad companies, was valued and assessed at such sum as, from all the information then before the board, seemed right and proper, and that the board had refused only to assess the franchises separate and apart from tangible property. The first return has thereby become of no value except as evidence, for the purpose of showing, with the other evidence in the case, what was actually done by the board in the matter of making such assessment. Such admissions by the respondents, with other statements in corroboration thereof, introduced in evidence, very naturally raise a doubt and inject an element of uncertainty in the case as to what was actually and in fact done, and the nature of the action taken by the board in the valuation of the properties which it was required to assess. While the true inquiry is, what was the action actually taken, and what property was in fact valued and assessed, the statements and conduct of the members of the board as to what was required of them in the assessment of railroad property seems to show a somewhat clouded condition of the mind, and afforded justifiable grounds on the part of the relators for the belief that the

board had failed and neglected to consider and include in its assessment property which they were by law required to value and assess with the other properties of such corporations. In the face of these declarations and admissions it is not to be wondered at that relators felt aggrieved, and regarded the action thus taken as evidencing something less than a full performance of official duty, to correct which the writ of mandamus ought to issue. Evidence of the character just alluded to, has not been lost sight of in our consideration of the question presented to us, and yet, from all the facts and the circumstances as disclosed by the record bearing on this point, we can not escape the conclusion that both the tangible and intangible property of the railroad companies was in fact assessed as one property, or as a unit; that the property was assessed as a live, going concern, and a valuation placed thereon when considered in connection with its use; and that those elements which render it valuable as an entire property, including within its scope all the essential qualities going to make up the whole property as a unit, were actually and in fact included in the assessment so made.

What we have heretofore said with respect to the assessment of railroad and telegraph property, and the necessity for uniformity in valuation with property generally throughout the state, applies more particularly to assessments provided for by the general revenue laws. It is contended by the relators that the state board of equalization altogether failed to take into consideration, in placing the valuation on property by it assessed, the fact that under certain assessment laws with respect to municipal taxes in cities of the metropolitan class and those of the first class having a population of over 40,000 a much higher standard of valuation of property for assessment purposes prevails than the average standard obtaining generally in assessments under the provisions of the general revenue laws. It is in evidence that in the city of Omaha, a city of the metropolitan class, the standard of value in the valuation and assessment of property for

municipal purposes is forty per cent. of its market value; that in the cities of Lincoln and South Omaha, which have a population bringing them within the other class mentioned, property is assessed for taxation for municipal purposes at its actual cash value. The laws authorizing the assessment of property in municipalities of the classes mentioned for municipal purposes provide that the properties of the railroad and other corporations required to be assessed by the state board of equalization shall be returned for assessment for municipal purposes in the municipalities referred to and to the municipal authorities, and taxes levied thereon at the same valuation as fixed by the state board of equalization. In respect of all other property subject to taxation values are fixed by the taxing authorities of the respective municipalities at an assessed valuation, as hereinbefore stated. It is obvious from what has just been said that the rule of uniformity is broken regarding the properties of the different corporations required to be assessed by the state board of equalization when the same property at the same value is assessed by the different municipal taxing authorities for municipal purposes. When all other property is assessed at forty per cent. of its fair cash value in one of the municipalities mentioned, and at its full fair cash value in the other two, and the railroad and other corporate property assessed by the state board of equalization is valued at one-sixth to one-tenth its fair cash value, an inequality in taxation is shown to exist, which is repugnant to the most rudimentary principles of justice. Such inequalities are not to be wholly unexpected when laws more or less local and special in their application are enacted by the legislature to conform to the wishes of each municipality whose needs are supposed to require a law peculiar to itself. If there are many taxing jurisdictions, operating under different laws, it is quite probable that the standard of valuation will greatly vary in different localities. It is at once apparent that the state board of equalization can not in one assessment conform to all these several standards if varying; and if an

attempt should be made to compromise by the ascertainment of an average standard, the rule of uniformity would be broken as to all, and would conform to none. The legislation with reference to the assessment of railroad and telegraph property by the state board of equalization was evidently enacted with the view of having all such property assessed by one assessing body at a uniform value for all property on a mileage basis, and in harmony with values as fixed for assessment purposes on other kinds of property on which taxes are levied for general revenue purposes, and such valuation apportioned throughout the state where the lines of such corporations extend. If certain municipalities, under laws applying only to them, assess property at a much higher ratio than that as made for all other purposes, it will readily be seen.that the board can not, under the law as it is at present constituted, conform to such valuation without violating the rule of uniformity as to all other property assessed for general revenue purposes. If these higher valuations obtaining in the municipalities mentioned were taken into account in the assessment of railroad properties by the state board of equalization, and a higher valuation placed on such property, it would be distributed over every mile of road within the state, and but little would, therefore, be added to the valuation of the property situated in such municipalities, and subject to municipal taxes. We know of no rule by which the state board of equalization, under the present law, can value railroad and telegraph properties in municipalities having taxing laws of their own at a uniform valuation with other property therein, when the standard of valuation is different from that prevailing under the general revenue laws. Section 6 of article 9 of the constitution declares that "all municipal corporations may be vested with authority to assess and collect taxes, but such taxes shall be uniform with respect to persons and property within the jurisdiction of the body imposing the same." The observance of this rule of uniformity in the assessment of property for municipal purposes is as

obligatory on the lawmaking body and the taxing authori-
ties as are the provisions of section 1 of the same article,
which we have heretofore discussed.    Whether the provis-
ions of law requiring that the assessment as made by the
state board of equalization shall be taken and accepted as
the correct assessed valuation for taxes for municipal pur-
poses, when a different standard of valuation prevails as to
all other property, is in contravention with the section of
the constitution quoted, we should not in this action, and
do not, decide.    It is sufficient to say that for the purpose
of this case, and in determining the issues before us, we
can consider only the assessment of all other property
throughout the state for general revenue purposes in de-
termining whether the fundamental law requiring uni-
formity in the valuation of property is violated.

It is also contended that in the assessment of sleeping
and dining cars owned by others than the railroad compa-
nies operating them within this state under the provisions
of sections 40a and 40b of the revenue act the state board of
equalization failed to assess such property in the manner
required by law.    It is contended by the relators that in the
assessment of such property the assessing board should
take into account the capital stock and the value of the
whole corporate estate of the corporations owning and
operating such sleeping and dining cars, and thereupon
assess that portion of the corporate property which is
represented by its sleeping and dining cars operated
within the state, as compared with the total property used
and operated in the conduct of corporate business.    In
other words, in effect the contention is that whatever may
be found to be the value of the franchise and intangible
property should be added to the value of cars assessed in
the same proportion as the value of such cars bears to the
total value of the tangible property of the entire corporate
estate.    Section 40a provides that the railroad companies
shall report to the state auditor the number of sleeping
and dining cars not owned by such corporation, but used
by it in operating its railway during each month of the

year, and also the number of miles each month that such cars have been run within the state, and the total number of miles that such cars have been run and operated each month within and without the state, and the owners of such cars. Section 40b makes it the duty of the state board of equalization to assess for taxation against the owners of such cars the average number of cars operated by the railway corporation each month; and it is further provided the assessed value of such cars shall bear the same proportion to the entire value that the monthy average number of miles that such cars have been operated within the state shall bear to the monthly average number of miles they have been operated within and without the state, and that such valuation shall be in the same ratio as that of the property of individuals. The constitution provides that the legislature shall direct in what manner the value of property subject to assessment shall be ascertained. The power to assess by the state board of equalization is derived from such provision and the laws in pursuance thereof. When no constitutional rule is violated, it is the exclusive province of the legislature to select a method by which all property shall be assessed and its value determined, and, when such provisions are made, the method adopted must be followed. 2 Elliott, Railroads, secs. 738, 739. It may be that law is defective in providing for the assessment of the property of sleeping and dining car companies which operate their cars in this state. It is clear, we think, that no provisions exist for the assessment by the state board of equalization of the capital stock of such corporations, or of their intangible property, as independent and distinct species of property which may be valued and assessed for tax purposes as being within the state and subject to taxation. The act provides simply for the assessment of the sleeping and dining cars at such a valuation in proportion to their entire value as the average number of miles over which they are used in this state compares with the total mileage within and without the state over which such cars are operated, such valuation to be in the same ratio as that

of property assessed to individuals generally. In ascertaining the value of such property under the law referred to, we are constrained to the view that the assessing board is not limited in finding the value of the cars assessed to the cost of construction alone or the value of the mere physical property disconnected from the uses to which it is put. The board may properly consider, in estimating the value of such property for assessment purposes, the cost of construction, the nature and use to which the property is put, its value as a means of earning income, and the profitableness of the use in its operation in the conduct and prosecution of the business engaged in by its owners. The statute, we think contemplates that in the assessment of such property, the assessment shall be at its true value when fixed and ascertained with reference to the value which it has as used and by reason of its use. For all that appears from the record before us, this is what was done by the state board of equalization in the assessment which is complained of, and for that reason no cause of action in respect to the assessment of such property has been established by the relators herein.

In the consideration of this case we have endeavored to cover all essential points raised under the issues as made by the pleadings. These different questions have been discussed at some length because of their vital importance in regard to a subject which at best involves many intricate and complex principles and rules of law, and regarding which human intellect and endeavor has as yet been unable to evolve a system which works harmoniously in all its parts, and operates evenly and with exact equality on all those required to contribute to the public revenues in support of government. There are some fundamental principles—such as uniformity in assessment, so that every taxpayer shall contribute a just proportion to the public revenues, according to the value of his or its property—which all recognize and acknowledge. But in the application of such principles to the intricate and varied property interests of the present industrial world we meet with innumer-

State v. Savage.

able difficulties, and much diversity of opinion exists as to a law which is just and equitable and operates on all alike. The just taxation of property must, in a large measure, be left to the vigilance, painstaking effort, candid opinion, and unbiased judgment of the taxing authorities; and when the law is so administered, meritorious grounds for complaint will be reduced to a minimum.

In the case at bar the extraordinary writ of mandamus has been applied for to compel the assessment of property regarding which respondents assert they have already in good faith assessed. The rule is universal that such a proceeding can be resorted to only for the purpose of compelling action, and can not be made a means of correcting errors or reviewing the proceedings of the assessing body. Such action, when taken, and when not tainted with fraud, can be reviewed only by some direct proceeding authorized by statute; and where none such is provided the action taken is conclusive except where impeached for fraud, or gross irregularity equivalent thereto. "Mandamus is not a proceeding to correct errors, but to compel action." *State v. Kinkaid,* 23 Nebr., 647. "Mandamus will not issue when its effect would be to reverse or vacate an order of a court or tribunal having jurisdiction to make such order, although the same may be palpably erroneous." *State v. Laflin,* 40 Nebr., 441.

It follows from what has been said that the writ prayed for will have to be denied, which is accordingly done, but without recovery of costs against relators.

WRIT DENIED.

NOTE.—The following are some of the figures upon which the railroad assessment of 1903 was based, inserted for the purpose of showing how the board arrived at the assessment. They were furnished, on request, by the Auditor and Mr. Bennett, secretary of the board:

*Estimate of Value of Omaha & Southwestern Railroad.*

| | |
|---|---|
| Omaha depot | $335,324 00 |
| Sheds for same | 11,314 00 |
| Depot grounds, Omaha | 200,000 00 |
| Depot grounds elsewhere | 14,000 00 |

| | |
|---|---|
| 51.79 miles track, right of way and permanent structures, $20,000 | $1,035,800 00 |
| 9 engines, $7,500 | 67,500 00 |
| 4 coaches, $3,500 | 14,000 00 |
| 1 passenger and mail car | 2,300 00 |
| 1 mail car | 4,400 00 |
| 1 mail and baggage car | 2,100 00 |
| 1 mail, passenger and baggage car | 2,250 00 |
| 1 baggage car | 2,600 00 |
| 3 caboose cars, $500 | 1,500 00 |
| 84 box cars, $280 | 23,520 00 |
| 41 stock cars, $270 | 11,070 00 |
| 15 flat cars, $195 | 2,925 00 |
| 40 coal cars, $505 | 20,200 00 |
| 2 refrigerator cars, $410 | 820 00 |
| 1 boarding car | 200 00 |
| 1 rubber car | 230 00 |
| 2 track scales, $400 | 800 00 |
| 3 water stations, $800 | 2,400 00 |
| 11 tool houses, $40 | 440 00 |
| 3 section houses, $800 | 2,400 00 |
| 2 engine houses, $5,000 | 10,000 00 |
| 2 coal houses, $2,500 | 5,000 00 |
| 3 ice houses, $2,100 | 6,300 00 |
| 6 stock yards, $200 | 1,200 00 |
| 7 depots, $1,000 | 7,000 00 |
| 1 turn-table | 1,500 00 |
| Miscellaneous property | 15,000 00 |
| | $1,804,093 00 |
| Average per mile | $34,756 00 |
| One-sixth per mile | 5,792 00 |
| One-seventh per mile | 4,965 00 |
| Actual assessment 1902 | 6,500 00 |

